Joe Gaytan
605Park Street
Elgin, IL 60120-4426
(224) 800-9904
jlgaytan@wowway.com
*Defendant in proper person*

**FILED**

FEB 2 7 2014 *U*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

SLEP-TONE ENTERTAINMENT )
CORPORATION, et al., )
      Plaintiff(s) )
  )
  )
vs. )
  )
  )
DIANE KLEMZ, et al., )
      Defendents. )

**CASE NO.:** 14-cv-189

## MOTION TO DISMISS

**COMES NOW**, Defendant Joe Gaytan, in proper person, and herein moves to dismiss

Plaintiff's Complaint on file herein.  This motion is made pursuant to Federal Rule of Civil

Procedure 12(b), the Points and Authorities attached hereto, the pleadings and papers on

file herein and any oral argument as may be given at time of hearing.

    Dated this 25th day of February, 2014.

              By _____

              Joe Gaytan
              605Park Street
              Elgin, IL 60120-4426
              (224) 800-9904
              jlgaytan@wowway.com

## POINTS AND AUTHORITIES

### Statement of facts

Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone") (referred to as "Slep-Tone") has in multiple federal district court venues across the country sued hundreds of karaoke hosts ("karaoke jockeys" or "KJs") and karaoke venues seeking damages for the alleged unauthorized display of the Sound Choice logo(s), or of marks belonging to other manufacturers,' which Slep-Tone claims constitutes trademark infringement. Of approximately fifty lawsuits, only one, *In Re Slep-Tone Entertainment Corp. consolidated cases*, Case No. 5:11-cv–32/RS-CJK, filed in the Northern District of Florida, Panama City Division, has gone to trial. There, Slep-Tone finally tried a case against three defendants and received a judgment against two of the defendants totaling only $9,585.00. No attorney's fees were awarded. *See* Exhibit 1, Judgment in the case of *In Re Slep-Tone Entertainment Corp. consolidated cases*, Case No. 5:11-cv–32/RS-CJK, filed July 17, 2012 in the Northern District of Florida, Panama City Division.

Instead of litigating cases, Slep-Tone has attempted to force numerous defendants into settling with threats of million dollar judgments and the seizure of the KJ's equipment. Slep-Tone then generally fails to pursue discovery. *See, i.e.,* Exhibit 2 and 3, Proposed Discovery Plan and Scheduling Order filed by the Hot Shots Defendants and the PTs Defendants in the case of *Slep-Tone Entertainment Corporation v. Ellis Island Casino & Brewery, et al.*, Case No. 2:12-cv-00239-KJD-RJJ, filed in the District of Nevada, Southern Division ("Las Vegas case"). Slep-Tone's trolling for settlements strategy consists of suing multiple, unrelated defendants in regional lawsuits because such joinder of unrelated defendants who are generally in competition with one another increases each

defendant's litigation costs making settlement for less than the defendant's estimated attorney's fees more attractive.

Slep-Tone has not sued for copyright infringement. Instead, Slep-Tone has sued for the display of its Sound Choice [and for marks belonging to other manufacturers'] trademark logo[s] during the playing of a karaoke track from a computer copy. However, the vast majority of Sound Choice discs do not have a "TM" or "®" symbol following the Sound Choice logo on the face of the disc. None of the Sound Choice discs this defendant has ever seen used has the TM or ® mark next to the Sound Choice logo when the disc is actually played and the Sound Choice logo is displayed on a television screen. See Exhibit 4, Affidavit of Joe Gaytan in Support of Motion to Dismiss, para. 2.

Sound Choice discs do contain a warning of a different nature which, if followed to the letter, would not allow for any karaoke performance at any public venue. Such "karaoke shows" are now, and have always been, Slep-Tone's and all other karaoke disc manufactures' bread and butter as the shows introduce people to karaoke, and most karaoke discs are sold to KJs specifically for that purpose. The warning states,

> WARNING: THIS MATERIAL IS PROTECTED BY FEDERAL COPYRIGHT LAWS, UNAUTHORIZED DUPLICATION, PUBLIC PERFORMANCE, OR BROADCAST IS A VIOLATION OF APPLICABLE LAWS. THESE ARE PROFESSIONAL RE-CREATIONS AND NOT RENDITIONS BY THE ORIGINAL ARTIST. See Exhibit 4, para. 3.

This Court should note that this warning makes no mention of copying or displaying the Sound Choice trademark logo and makes no mention of the word "trademark" which is the basis of the present lawsuit. This warning is simply designed to protect the song and music from copyright infringement, and nearly all karaoke venues, which also play background or jukebox music, generally satisfy their obligations to the original artists by

paying monthly fees to ASCAP (American Society of Composers, Authors and Publishers), BMI (Broadcast Music, Inc.) and SESAC, Inc.

Thus, the warning on the face of some Sound Choice discs bears no relationship to the present case, and Slep-Tone has without warning, and without clearly identifying the Sound Choice logo as a trademark, sued the defendants in the present case. Nowhere in the Complaint is there any mention of the specific Sound Choice discs which were allegedly observed being played at each individual defendant's karaoke show making it is impossible to determine whether the tracks being played from a computer had specified on the face of the disc from which the track was taken the Sound Choice logo with the appropriate trademark designation.

### Standard of review

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and "only a complaint that states a plausible claim for relief survives a motions to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50 (2009). To survive a motion to dismiss a complaint must include "enough facts to state a claim to relief that is plausible on its face," and this "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Ashcroft*, 129 S.Ct. at 1960, *quoting, Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Factual allegations "must be enough to raise a right to relief above the speculative level," and provide more than, "a suspicion [of] a legally cognizable right of action," and, "[w]here a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief." *Toyota Motor Sales, U.S.A., 6 Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010).

To withstand a motion to dismiss, the complaint must set forth sufficient facts to establish all necessary elements of a claim for relief so that the adverse party has adequate notice of the nature of the claim and the relief sought. *Johnson v. Riverside Healthcare*, 534 F.3d 1116, 1123 (9th Cir. 2002); Fed. R. Civ. P. 8(a). The Court is not required to accept as true allegations that are merely conclusory. *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action's elements that is conclusory does not state a claim to relief plausible on its face. *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

### Slep-Tone's allegations are too generalized and conclusory to survive a motion to dismiss.

Slep-Tone's Complaint is filled with generalized, conclusory allegations which are not directed to any specific defendant. Most of the allegations are made against all the defendants in mass. In that regard, Slep-Tones's allegations are formulaic recitations of the elements of its claims and fail to allege specific claims against specific defendants plausible on their face. Slep-Tone's allegations are generally speculative and have been made in a vain attempt to be consistent with the defendants being liable under the alleged causes of action, but Slep-Tone's allegations only state Slep-Tone's suspicion that it has legally cognizable causes of action. Slep-Tone's Complaint fails to establish all necessary elements of its claims for relief and fails to provide defendants adequate notice of the nature of its claims because Slep-Tone's claims are all based of the defendant's failure to adhere to Slep-Tone's fabricated conditions of tolerance which have no legal basis, and Slep-Tone then simply concludes that defendants must then be liable for acts of counterfeiting as if defendants are duplicating Sound Choice karaoke discs and offering those discs for sale

although none of the defendants are so accused. No consumers are alleged to have been fooled into believing that a disc they purchased was an original, genuine Sound Choice disc.

The defendants are not alleged to have sold any discs, counterfeit or otherwise. The defendants are not alleged to have tried to convince any patron of any karaoke venue that karaoke song tracks played from the defendants' computers have been copied to the defendants' computers with any input, sanction or involvement of Slep-Tone or Sound Choice [or any other manufacturer]. In fact, as will be demonstrated herein, Slep-Tone cannot input, sanction or involve itself in any way in the copying of its karaoke discs to a computer because Slep-Tone has no authority to authorize or sanction any media or format shifting of its product.

Slep-Tone's Complaint must be dismissed as it relates to trademark infringement because the defendants have no obligation to inform Slep-Tone or receive permission from Slep-Tone to make a media and format shift.

Slep-Tone's Complaint makes reference to certain conditions which Slep-Tone has called from time to time "conditions of tolerance" in defining what constitutes a pirated karaoke accompaniment track which allegedly displays a counterfeit Sound Choice trademark. *See, i.e.,* Exhibit 5, Complaint in the Las Vegas case, ¶¶ 71-73. Reference to this arbitrary standard under which Slep-Tone tolerates but does not approve of a computer copy being made from one of its karaoke accompaniment discs confuses the theory upon which Slep-Tone claims entitlement to relief. *See* Complaint, ¶¶ 26-31.

Slep-Tone claims it never authorizes media-shifting or format-shifting of its karaoke accompaniment tracks for any commercial purpose.  Slep-Tone also claims it does not authorize media-shifting or format-shifting *outside its conditions of tolerance*.  Thus, while it would appear Slep-Tone authorizes media-shifting and format-shifting copying of its product so long as its conditions of tolerance are met, Slep-Tone cannot actually give any such authority.  Because of its contracts with the holders of the copyrighted materials, Slep-Tone cannot and will not approve, authorize or license any media or format shifting of its karaoke disc product.  Slep-Tone only tolerates such copying by agreeing not to sue so long as its conditions of tolerance are met.
*See* Exhibit 4, para. 4, 5.

Clearly not all of Slep-Tone's conditions of tolerance are enforceable.  Slep-Tone is not damaged so long as the KJ has 1:1 correspondence meaning that a Sound Choice disk was purchased to back up each copy on the KJ's computer.  With proper labeling and warning, and assuming Slep-Tone does not itself have unclean hands, such a condition of tolerance may be tenable.  However, Slep-Tone is not damaged if the KJ fails to notify Slep-Tone every time the KJ copies a Sound Choice disc.  That conditions of tolerance are excessive because Slep-Tone is not damaged by any failure to comply with the registration or notification condition and because compliance with Slep-Tone's conditions of tolerance enable Slep-Tone to financially benefit by being able to keep track of the KJ for marketing purposes.  *See* Exhibit 4, para. 4.  The Panama City Court made no mention of the defendant failing to notify Slep-Tone of a media and format shift or of the defendant failing to register with Slep-Tone but, instead, the Panama City court, which did not consider all

the arguments made in this motion, confined its ruling to whether a 1:1 correspondence was maintained.

**Slep-Tone's Complaint must be dismissed because Slep-Tone has come to a court of equity with unclean hands.**

One who comes into equity must come with clean hands.  In the present case, Slep-Tone seeks the assistance of this Court to further an illegal relationship and, therefore, is not entitled to relief.  *See Loughran v. Loughran,* 292 U.S. 215, 229-30 (1934).

Slep-Tone set up a "safe harbor" website whereby Slep-Tone encourages KJs to make computer copies of its product for ease of putting on a karaoke show so long as the KJ allows Slep-Tone to audit their computer to guarantee a 1:1 correspondence between any song track on the KJ's computer and the song tracks contained in the KJ's Sound Choice karaoke disc library. The KJ must also register with Slep-Tone which allows Slep-Tone to more easily market further product to the KJ.  *See* Exhibit 4, para. 4.

Kurt Slep, CEO of Sound Choice, admitted,

We do not have the rights from the Music Publishers (who represent the song writers) to grant the transfer of our music from the CDG to a hard drive, that is why we have not licensed "hard drives" per se. *See* Exhibit 4, para. 5.

Slep-Tone cannot authorize a computer copy being made of its karaoke disc product but encourages KJ's to make such computer copies by setting up its safe harbor whereby a KJ may receive from Slep-Tone a covenant not to sue in return for the KJ abiding by Slep-Tone's conditions of tolerance when making a computer copy of a Sound Choice disc.  Since Slep-Tone's Complaint seeks the seizure of defendants' karaoke equipment, Slep-Tone is coming to a court of equity with unclean hands and is not entitled to the equitable relief it

and (3) that defendant's use of the mark is likely to cause confusion, to cause mistake or to deceive." *Toho Co., Ltd. v. William Morrow and Company, Inc.*, 33 F.Supp.2d 1206, 1210 (C.D. Cal 1998), *citing,* 15 USC § 1114(a); *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288, FN 2 (9th Cir. 1992).

Slep-Tone's Complaint is confusing in its cause of action. In essence, it alleges that the defendants made computer copies of Sound Choice discs to assist them in producing karaoke shows. The projection on the television screen and the music played in the background remained the same except instead of the KJ needing to keep track of a thousand discs, loading and unloading them into a karaoke disc player, the KJ merely needed to search for the correct song track in the KJ's computer and click on the appropriate song. In that regard, nothing has changed in what is projected or heard.

What Slep-Tone alleges through pure speculation is that the KJ would not be able to produce a karaoke show the old fashion way because Slep-Tone speculates that the KJ does not have, or does not still have, all the discs to put on the same karaoke show by using all the original discs and tediously feeding them one after another into a karaoke disc player. However, Slep-Tone has failed to allege any defendant has made a false designation of origin or a false or misleading representation of fact.

**There is no likelihood of confusion because Slep-Tone sells to purchasers of Sound Choice karaoke discs and not to patrons of a karaoke bar waiting for their opportunity to sing who do not purchase any karaoke disc from the KJ.**

If the court determines as a matter of law from the pleadings that confusion is unlikely, then the complaint should be dismissed. *Murray v. Cable Nat'l Broadcasting Co.*, 86 F.3d 858, 860 (9th Cir. 1996), *citing, Toho Co. Ltd. v. Sears Roebuck & Co*, 645 F.2d 788,

790-791 (9th Cir. 1981). A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or are associated with, the services of another provider. *Murray*, 86 F.3d at 860-61 (9th Cir. 1981).

Trademark law is concerned with the protection of symbols used to identify a product in the marketplace and to prevent confusion as to its source. *RDF Media Ltd. v. Fox Broad. Co.*, 372 F.Supp.2d 1, 13 (C.D. Cal. 2004). Trademark claims are subject to a commercial use requirement "to secure the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Bosley Med Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005), *quoting, Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

The United States Trademark Trial and Appeal Board held in *In re The W W Henry Company, L.P.*, 82 U.S.P.Q.2d 1213 (T.T.A.B. 2007), that Confusion between the two products carrying nearly the same mark ("PATCH 'N GO" vs. "PATCH & GO", one a chemical filler sold to plastic manufactures and one a drywall patch sold to do-it-yourselfers, respectively) was unlikely because the two products would be sold "to different classes of purchasers through different channels of trade. Similarly, the Federal Circuit in *Electronic Design & Sales, Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713 (Fed. Cir. 1992), held that confusion because two products carrying nearly the same mark ("E.D.S." v. "EDS", one selling data processing services to medical insurers and one selling batteries and power supplies to makers of medical equipment, respectively) was unlikely even though both parties sold products to the medical industry.

In the present case, Slep-Tone has alleged ownership of a valid trademark, but Slep-Tone must also allege likelihood of confusion from the defendant's use of the mark. Slep-

Tone must also allege commercial use of its mark, that its business's goodwill is being diminished by the use of its mark and that the relief sought will protect the ability of consumers to distinguish Sound Choice from among competing producers.

Confusion in the present case is unlikely as a matter of law because viewers and participants in karaoke shows are not Slep-Tone customers; Slep-Tone sells Sound Choice karaoke discs to KJs and enthusiasts. Neither the KJ nor the venue sale karaoke discs, and the KJ and venue merely provide a service of putting on karaoke shows. Neither the KJ nor the venue compete with Slep-Tone in the production and marketing of karaoke accompaniment compact discs. The relief requested does not protect the ability of consumers to distinguish Slep-Tone's product from the KJ's or venue's services.

Slep-Tone is not in the business of providing services, so a customer is not likely to be confused about whether Sound Choice is associated with putting on the karaoke show. The consumer is not likely to misspend their money because of any confusion causing them to patronize the venue and spend money at the bar.

Based on the allegations made in the Complaint, confusion is unlikely as a matter of law requiring the dismissal for failure to state a claim.

**Slep-Tone has no claim for a non-trademark use of the Sound Choice mark.**

Infringement laws do not apply to a non-trademark use of a mark. *New Kids on the Block v. New Am. Publ'g, Inc.*, 971 F.2d 302, 307 (9th Cir. 1992). Direct trademark infringement attaches to "those who actually manufacture or sell infringing materials." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996).

The KJ and venue are not selling CDs with the Sound Choice trademark on them. Unauthorized disc copies stamped with the Sound Choice trademark would be true

counterfeits of the Sound Choice product. Sound Choice has no case because its mark applies to the marketing of CDs, not to the provision of services.

Neither the KJs nor the venues are alleged to have actually manufactured or sold infringing product materials.

**Slep-Tone has no cause of action for counterfeiting.**

15 U.S.C. § 116(d)(1)(B)(I) defines a "counterfeit mark" as a "counterfeit of a mark that is registered on the principal register…for such goods or services sold, offered for sale, or distributed".

18 U.S.C. § 2320(e)(1)(A)(iii) defines a "counterfeit mark" as a "spurious mark…that is applied to or used in connection with the goods or services for which the mark is registered with the United States Patent and Trademark Office."

The legislative history found in 130 Cong. Rec. H. 12078-79, (joint statement on 1984 trademark counterfeiting legislation) and reprinted in Vol. 8, at p. 34-619, states, "[B]ecause this act is intended to reach only the most egregious forms of trademark infringement, it does not affect cases in which the defendant uses a registered mark in connection with goods or services for which the mark is not registered." *See also, Gilson on Trademarks*, § 5.19.

To meet the definition of a "counterfeit mark," "[15 U.S.C.] Section 1116(d) requires that the mark in question be (1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 945-46 (9th Cir. 2011). In order to sustain a counterfeiting claim a plaintiff must allege and prove that the defendant is using the allegedly counterfeit mark in

connection with the exact good and services set forth in its registration. *Louis Vuitton*, 658 F.3d at 945-46.

At best, the Sound Choice mark was merely displayed as part of the karaoke show service. The Sound Choice mark are not alleged as having been displayed on the same goods or in the same context as the product sold by Slep-Tone. Defendants are not alleged to have counterfeited anything sold to the public whereby the public was fooled into believing that the goods being sold were manufactured by Sound Choice as, for example, would be the case of a counterfeit Rolex watch sold in Hong Kong for $40.00 where the buyer might actually believe he got a great deal on a genuine Rolex. The goods and services used during a karaoke show are different from the goods Slep-Tone sales or as genuine Sound Choice discs. Slep-Tone has no cause of action for counterfeiting.

### Any display of the Sound Choice mark was a nominative fair use and is non-actionable.

The issue of nominative fair use may be considered on a motion to dismiss. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1466-67 (9th Cir. 1993). Three factors determine whether a nominative fair use has occurred; they are (1) whether the product was "readily identifiable" without use of the mark, (2) whether the defendant used more of the mark than necessary and, (3) whether the defendant falsely suggested he was sponsored or endorsed by the trademark holder. *Toyota Motor Sales, U.S.A.*, 6 Inc. v. Tabari, 610 F.3d 1171, 1175-76 (9th Cir. 2010), citing, *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002).

A defendant is not liable under the Lanhan Act for a nominative fair use which includes use of the plaintiff's mark to describe or identify the plaintiff's product where the

defendant's ultimate goal is to describe or identify his own product and that it is not necessary for the defendant to affirmatively announce that its product or service is not sponsored by the plaintiff to find that the defendant did not falsely suggest that he was sponsored or endorsed by the trademark holder and that, "A defendant's use is nominative where he or she used plaintiff's [mark] to describe or identify the plaintiff's product, even if the defendant's ultimate goal is to describe or identify his or her own product," and "[w]here use of the trade dress or mark is grounded in the defendant's desire to refer to the plaintiff's product as a point of reference for defendant's own work, a use is nominative." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 809-11 (9th Cir. 2003).

"[A] defendant who raises the nominative fair use issue need only show that it uses the mark to refer to the plaintiff's trademarked goods or services. The burden then reverts to the plaintiff to show a likelihood of confusion under the nominative fair use analysis." J. Thomas McCarty wrote in 3 J. Thomas McCarthy, *McCarthy On Trademarks And Unfair Competition* § 23.11 (4th ed. 2006 & Supp. 2012).

This Court has the power to determine from its examination of the pleadings whether there has been a nominative fair use as a matter of law and, if so, dismiss Slep-Tone's Complaint.

Slep-Tone is in the business of marketing CDs, a physical product, not putting on karaoke shows, a service not covered by its trademark registration. When a copy of a Sound Choice karaoke disc track is played at a karaoke show, the Sound Choice mark is not displayed to identify the defendant's karaoke services but to identify the origin of the track. Sound Choice is correctly identified as the origin of the track when the Sound Choice trademark is displayed. Neither the KJ nor the venue are alleged to have falsely suggested

they were sponsored or endorsed by Sound Choice. The defendants are not alleged to have displayed the Sound Choice mark more than necessary. Any display of the Sound Choice mark is purely incidental to the playing of the computer copy and merely identifies Sound Choice as the creator of the karaoke disc from which the copy was made.

The KJ's ultimate goal is to identify himself as the one who puts on a show which brings people into the venue. Slep-Tone has not alleged the KJ is using the Sound Choice mark to identify his or her services. The Sound Choice mark is only used to identify the origin of the track. There can be no likelihood of confusion in this regard as neither the KJ nor the venue are alleged to have identified themselves as the creator of the product. Slep-Tone has not alleged the KJ or the venue have falsely suggested they were sponsored or endorsed by Sound Choice or Slep-Tone.

Neither the KJ nor the venue had any affirmative duty to announce Slep-Tone or Sound Choice did not sponsor and did not endorse their karaoke show. At best, the defendants' reference to Sound Choice's karaoke discs was as a point of reference for the purpose of giving the karaoke singer a choice of song and arrangement. Any display of the Sound Choice mark is a nominative fair use as a matter of law and, therefore, neither the KJ nor the venue are liable for displaying the Sound Choice mark.

**There is no claim for unfair competition since the standard is the same as for trademark infringement.**

"When trademark and unfair competition claims are based on the same [alleged] infringing conduct, court apply the same analysis to both claims." Taho *Co., Ltd. v. William Morrow and Company, Inc.*, 33 F.Supp.2d 1206, 1210 (C.D. Cal. 1998), *citing, E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, FN 2 (9th Cir. 1992). "The Ninth Circuit has held that the tests for Federal Trademark Infringement under Title 15 U.S.C. § 1114, False

Designation of Origin under Title 15 U.S.C. § 1125 and unfair competition involving trademarks, are the same." *Visa Intern. Service Ass'n v. Visa Hotel Group, Inc.*, 561 F.Supp. 984, 989 (D. Nev. 1983).

If Slep-Tone has no trademark infringement claim, then it has no unfair competition claim.

**CONCLUSION**

In conclusion, Slep-Tone's Complaint should be dismissed in its entirety.

Dated this 25th day of February, 2014.

By _____
Joe Gaytan
605 Park Street
Elgin, IL 60120-4426
(224) 800-9904
jlgaytan@wowway.com
*Defendant in proper person*

## CERTIFICATE OF MAILING

I hereby certify that on the 26th day of February, 2014, I mailed a true and correct copy of the foregoing MOTION TO DISMISS via first class mail, postage prepaid, and in a sealed envelope, by depositing same in a receptacle marked for mailing with the United States Postal Service and addressed to the following:

The Law Offices of Konrad Sherinian, LLC
1755 Park Street, suite 200
Naperville, IL  60563

Cheryl Baggs
630 North Cooper Road
New Lennox, IL  60451-1423

Shannon Condon, Esq.
Gardiner Kock Weisberg & Wrona
53 West Jackson boulevard, Suite 950
Chicago, IL 60604

Laura Drzewiecki
358 Richert Court
Elgin, IL  60120

John Jensen
111 Terry court
Woodstock, IL  60098

Bernie Weiler, Esq.
Mickey, Wilson, Weiler, Renzi, & Anderrson
2111 Plum Street, Suite 201
Aurora, IL  60506

Diane Klemz
2004 Cumberland Green Drive
Saint Charles, IL  60174

Mary Mac McCloskey & Maryaoke Karaoke, Inc.
1357 W Ancona Street, Apt 2
Chicago, IL  60642-7954

By _____
Joe Gaytan
665 Park Street
Elgin, IL 60120-4426
(224) 800-9904
jlgaytan@wowway.com
*Defendant in proper person*

# EXHIBIT 1

Judgment in the case of *In Re Slep-Tone Entertainment Corp.*
*consolidated cases*, Case No. 5:11-cv–32/RS-CJK, filed July 17, 2012 in the
Northern District of Florida, Panama City Division.

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**In Re SLEP-TONE ENTERTAINMENT CORP.**
**consolidated cases,**

**CASE NO. 5:11-cv-32/RS-CJK**

_____/


## JUDGMENT

**Procedural History**

  If the number of defendants in this action is any indication, karaoke is popular in the various watering holes of the Northern District and throughout Florida. Plaintiff brought five trademark infringement cases against dozens of defendants representing a who's who of Florida's nightlife. The names read like Facebook updates from spring break: Tequila Mexico, Mugs N Jugs, Malibu Lounge. Those cases were consolidated into this action. (Doc. 66). I transferred numerous defendants to the appropriate judicial district. (*e.g.* Doc. 71).

  After months of settlement conferences, many of the defendants chose the door rather than face the music. Now that it's "last call," only three defendants remain: Donovan's Reef Lounge & Package Store, Inc. ("Donovan's"), Green Glass Mall Inc. ("Green Glass"), and Robert L. Paynter, Sr. A nonjury trial was conducted before the Court July 2 and 3, 2012, on Plaintiff's three count complaint for trademark infringement, unfair competition, and Florida deceptive and unfair trade practices. The parties were

allowed to submit proposed findings of fact and conclusions of law. (*See* Docs. 197, 198, 199, & 200). I have considered these proposals.

**Findings of Fact**

Plaintiff is a business involved in the distribution of prerecorded karaoke music products on compact discs. Tr. 15. Plaintiff holds a valid registered trademark of the term "Sound Choice." (Pl. Ex. 1 & 3). The Sound Choice trademark had been renewed several times and is current. (Pl. Ex. 2 & 4). The Sound Choice mark appears on all of Plaintiff's products including the discs themselves, the accompanying disc inserts, and the video portion of the product that the end-user views. Tr. 19.

Plaintiff produces two types of products, Compact Discs plus graphics ("CD+G") and MP3 plus graphics ("MP3+G"), which contain the karaoke songs. Tr. 20-21. Each song has a current retail value of seventy-five cents. In the past, each song had a retail value of $1.50, but Plaintiff lowered the price to compete with pirated copies. Tr. 60. Plaintiff sells its product only on disc and does not sell their product on computer hard drives. Tr. 20-21. However, many karaoke jockeys ("KJs") and others have transferred the content of their compact discs to hard drive because of the ease by which songs can be played. Tr. 23. This process is called "media shifting." Tr. 23.

In response to what was occurring in the marketplace, Plaintiff created a "media shifting policy." This policy contained several components. First, is the "one-to-one" component which provides that for each song on a hard drive, the possessor must own, have purchased, and still possess the original disc. Tr. 23. Second is the notification

component where the user must notify Plaintiff of their intent to media shift.  Finally, the

audit component requires that Plaintiff conduct an examination and comparison of the

hard drive and the compact discs to ensure the one-to-one ratio.  Tr. 24.  During the audit

process, Plaintiff has the capability to determine whether Sound Choice files have been

deleted from the hard drive.  Tr. 26.  Entities that go through this process and pass the

audit are issued a covenant not to sue which explains the policy and defines their rights.

Tr. 24-25.  Being out of compliance with the one-to-one component voids the entire

media shifting policy and covenant not to sue.  Tr. at 27-28.

      The current media shifting policy has been in place since approximately 2007.  Tr.

62-63 & 118.  Before 2007, the policy evolved with changes in technology in a somewhat

ad hoc fashion.  The policy is communicated to users with literature included with each

new disc and in various trade magazine advertisements.  Tr. 62-63 & 81.  Copies of the

policy or of the communications of the policy were not submitted into evidence.

      Before this policy was implemented in 2007, Plaintiff contends that it did not grant

its consent to *any* media shifting.  Tr. 236.  Mr. Slep testified that the discs themselves

contained the "standard" warning that copying, rebroadcasting, or retransmission is not

permitted.  Tr. 64.  Thus, Mr. Slep asserted that by default, no copying was allowed.  Tr.

80.  No discs were introduced into evidence which bore these warnings, although no one

contested that the warnings appeared on the discs.

### A.     Corporate Defendants

Defendants Donovan's and Green Glass[1] (collectively "corporate defendants") are

Panama City Beach businesses which have some overlap in ownership.  Tr. 144-145.

George Davis testified on behalf of both companies as their manager and part owner.  *Id.*

Each business operates a bar and a separate liquor store.  Donovan's also operates a

convenience store.  *Id.*  The corporate defendants put on karaoke shows using their own

equipment.  Tr. 145.

The equipment mainly consisted of three red hard drives ("the red hard drives")

which are identical to each other in terms of karaoke content.  Tr. 34, 53-54, 160.  The

red hard drives were created from an older silver hard drive by transferring the content of

the silver drive to each of the three red hard drives.  Tr. 160.  The silver drive, in turn,

was initially created in 2007 when the corporate defendants hired a person to media shift

all of their compact disc karaoke holdings onto two silver drives, both of which are no

longer functional.  Tr. 160.  The three red hard drives were used in the following

manner: one for Donovan's, one for Green Glass, and one as a backup.  Tr. 160.

During discovery in this suit, Plaintiff audited Donovan's red hard drive and

compared its content to the corporate defendants' compact disc holdings.  Tr. 34.[2]  The

results of this analysis were admitted into evidence.  (Pl. Ex. 5 & 6).[3]  The corporate

defendants together owned a combined total of 239 Sound Choice *physical* discs.  (Pl.

---

[1] Green Glass operates a bar called "Sweet Dreams."  Donovan's operates under its own name.  Tr. 128
[2] Plaintiff did not audit all three hard drives because the corporate representative stated that the three red hard drives were identical in terms of content.
[3] Besides Sound Choice music, all Defendants contend that their systems possessed karaoke tracts from other producers besides Plaintiff.  Plaintiff was limited to inspecting only those digital folders which contained Sound Choice music.  They were not allowed to inspect other folders containing music from different karaoke tract producers.  Tr. 36.

Ex. 5). Of the 222 discs appearing on Donovan's hard drive, 80 were missing from Donovan's CD collection. Of the 222 discs appearing on Green Glass' hard drive, 135 were missing from Green Glass' CD collection. For the backup hard drive, 211 of 222 were missing. (Pl. Ex. 6, p. 12); Tr. 41-42. Plaintiff contends that the corporate defendants were, thus, in violation of their media shifting policy's one-to-one component.

The corporate defendants asserted that, at one time, they were in one-to-one compliance for each of the red hard drives. Over the years, many discs were lost, stolen, or made inoperable by the smoke-filled and booze-laden environments in which they were stored. Tr. 160, 171-72.

Mr. Slep visited Green Glass on one occasion and witnessed the Sound Choice mark displayed during several karaoke performances. Tr. 29. No other witnesses testified about viewing the Sound Choice mark at any of the Defendants' locations.[4]

Both Green Glass and Donovan's were profitable enterprises and no doubt they profited to some extent by their karaoke shows. (Pl. Ex. 8, 9, 10, & 11). They did not charge patrons a cover charge or a fee to participate in karaoke. Tr. 128-29.

## B. Individual Defendant

Defendant Paynter is a karaoke jockey; he is hired by individuals or business to put on karaoke shows. Tr. 187. Mr. Paynter owns one karaoke system which is on an external hard drive. Tr. 176. He puts on one show per week at a Tallahassee

---

[4] Plaintiff had an investigator visit some of the Defendants' location. The investigator is now deceased and his report was not admitted into evidence. Any references to the investigator or his report are not evidence. See Tr. 225.

establishment named Po' Boys and the occasional private engagement. Tr. 187. For his

services, Po' Boys pays him $200 ($175 plus a $25 bar tab). Tr. 188.

In response to this civil litigation, Mr. Paynter "eliminated all of the Sound

Choice songs from [his shows] and removed them from his hard drive." Tr. 179-80; Pl.

Ex. 13; (Ans., Doc. 118, p.2). Specifically, Mr. Paynter deleted those tracks from his

hard drive using the "delete key" but did not use any deleting software. Tr. 179-80 &

287. Mr. Paynter did this because he believed that by deleting the Sound Chose songs he

would remedy this lawsuit. Tr. 179. Mr. Paynter did not believe that he was purposefully

destroying evidence although Mr. Paynter received a letter about evidence preservation

from Plaintiff's counsel along with the summons.[5] (Pl. Ex. 14). However, Plaintiff

never inspected Mr. Paynter's hard drive to see if it could determine which tracks had

been deleted. Tr. 77-78. Additionally, no witnesses testified to seeing the Sound Choice

mark displayed by Mr. Paynter.


## Conclusions of Law

### A. Trademark Infringement

This is not the typical trademark case where the infringer produces a product and

markets it under the trademark of another. *E.g., Kentucky Fried Chicken Corp. v. Smith*,

351 F. Supp. 1311 (E.D. Mich. 1972) (Al's Kentucky Fried Chicken infringed on

Kentucky Fried Chicken's trademark). This is not even the typical case of pirated media

---

[5] There is some dispute about whether Mr. Paynter was properly served at the beginning of trial. Default was entered against Mr. Paynter because he failed to timely respond to the complaint. (Doc. 88). This default was later set aside because Mr. Paynter brought forth some evidence that his aged father accepted service at the wrong address. (Doc. 113).

sold as an original. *Beachbody, LLC v. Johannes*, 2011 U.S. Dist. LEXIS 90721 (C.D. Cal. 2011) (P90X DVDs sold on eBay). Rather, this is a case where the alleged infringer made an identical replica of Plaintiff's product and displayed them to the public as part of their business.

This is a unique area of trademark law. In general, the infringement of digital media is pursued using copyright law. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003) (Posner, J.) (swapping copyrighted music infringes copyright). Here, Plaintiff is not the holder of the karaoke tracks copyright because it is not the singer, songwriter or music publisher. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 920 (2005). Rather, the only avenue by which Plaintiff can protect its product is through the Sound Choice trademark that is displayed on the discs themselves and on the screen during performances. Because copyright and trademarks are related but distinct property rights, *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 721 (9th Cir. 2004), Plaintiff's trademark claim may properly be pursued in this context. That is, the holder of a trademark may restrict its use by the terms of the holder's consent. *See Stevens v. Gladding*, 58 U.S. 447, 452-453 (1855) (purchaser of a copperplate may not use it to make maps where he has not acquired the separate right to print maps).

The Lanham Act makes liable any person who, without the consent of the trademark registrant, uses "in commerce any . . . copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1)(a).

To prevail on a claim of trademark infringement, plaintiff must establish: (1) that they possess a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark in connection with the . . . distribution . . . of goods or services, and (5) that the defendants used the mark in a manner likely to confuse consumers. *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008).

Here, everyone agrees that Plaintiff has a valid mark. As to the usage element, the only direct evidence in the record is Mr. Slep's one visit to Green Glass where he viewed the Sound Choice mark being displayed. No other witnesses testified that they viewed the Sound Choice mark at Donovan's or with Mr. Paynter. Circumstantial evidence exists that the corporate defendants possessed copies of the Sound Choice mark and displayed them. Mr. Davis testified that two of the three red hard drives were used either at Green Glass or Donovans. Those hard drives contained Sound Choice music as well as music from other producers. It is likely that some Sound Choice songs were played in the many years since the corporate defendants began hosting karaoke shows. Plaintiff has met its burden as to this element for the corporate defendants.

As to Mr. Paynter, the <u>only</u> evidence Plaintiff has presented that he used their product is the fact that he admits to possessing Sound Choice recordings and to deleting them from his hard drive. Because the hard drive was never inspected, we do not know how many songs were deleted from his hard drive. And, more importantly, we do not know the ratio of songs on hard drive to songs on CD.

Plaintiff asks the Court to use the adverse inference rule because Mr. Paynter admits to deleting Sound Choice tracks after this litigation was begun. The adverse inference rule provides that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) (citation and quotation omitted). An adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith. *Bashir v. AMTRAK*, 119 F.3d 929, 931 (11th Cir. 1997).

I find that the adverse inference rule is not applicable to the facts of this case. First, Plaintiff never sought to remedy the situation by seeking production of Mr. Paynter's hard drive so that it could analyze which songs had been deleted. Second, the issues surrounding the service of Mr. Paynter draw into question whether he had received Plaintiffs warnings not to destroy evidence. Finally, it may have been wrong for Mr. Paynter to believe that deleting the offending material would remedy the situation, but Plaintiff has not demonstrated that it was done in bad faith. For these reasons, I find that Plaintiff has not met its burden to establish that Mr. Paynter improperly used the trademark.[6]

Turning to the third prong, Plaintiff has satisfied its burden to establish that the corporate defendants' use was "in commerce." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001) (holding that free distribution of software over

---

[6] Plaintiff also argues for an adverse inference against the corporate defendants based upon circumstantial evidence that they hid evidence. (Doc. 198, p. 17-18). Plaintiff should have addressed evidentiary concerns with a pretrial motion directed at these specific issues. I find that Plaintiff has not met its burden to show that the adverse inference rule is applicable to the corporate defendants.

the internet is sufficient to meet in commerce prong). "The term 'use in commerce'

denotes Congress's authority under the Commerce Clause rather than an intent to limit the

Lanham Act's application to profit making activity. *Id.* (citation and quotation omitted).

Likewise Plaintiff has satisfied its burden to establish that the corporate defendants

used the mark "in connection with the . . . distribution . . . of goods or services." That is,

the Sound Choice mark was displayed during the presentation of a karaoke show, a

service provided by Green Glass and Donovans. [7]

Finally, Plaintiff has also satisfied its burden to establish that the corporate

defendants use was likely to cause confusion. There are seven factors to be considered as

to the likelihood of confusion: (1) type of mark; (2) similarity of mark; (3) similarity of

the products the marks represent; (4) similarity of the parties' retail outlets and customers;

(5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion.

*Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. Fla. 2008) (citation

omitted). "Of these, the type of mark and the evidence of actual confusion are the most

important." *Id.*

Because the products in question were media shifted, the displayed trademarks

were identical, or nearly identical to the original product. Thus, the similarity of the mark

could not be distinguished from Plaintiff's registered mark. Defendants intended to make

them indistinguishable and most customers likely never knew that they were viewing

unauthorized copies of the karaoke tracks.[8]

---

[7] If Plaintiff had satisfied its burden for usage for Mr. Paynter, his usage would also have been in commerce and in connection with the distribution of a service.
[8] If Plaintiff had satisfied its burden for usage for Mr. Paynter, they would have established this element.

Defendants argue that they had some form of implied consent to display the Sound Choice mark during their karaoke shows. In essence, their argument is that the "standard" warning contained on the discs was meant only to protect the copyright holder (i.e. the recording artist etc.) and not Plaintiff who was the trademark holder. They thus contend that they were free to transfer their disc collection to hard drive. None of the parties have cited a case on point. However, I find that a generalized warning which prohibits copying a disc is sufficient to put a user on notice that the trademark holders do not consent to copying their associated marks.

Defendants also assert that the media shifting policy is ineffective because it was not properly communicated to them. I need not reach this issue because I find that the standardized warning on the discs prohibited all copying by default.

## B. Unfair Competition

Section 43(a) of the Lanham Act creates civil liability for

> [a]ny person who, on or in connection with goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

15 U.S.C. § 1125(a)(1).

The facts which support a cause of action for trademark infringement also support a cause of action under unfair competition. *Chanel, Inc. v. Italian Activewear of Florida,*

*Inc.*, 931 F.2d 1472, 1475, n.3 (11th Cir. 1991). The same set of facts enabling a party to prevail under Section 1114(a)(1) will result in recovery pursuant to Section 1125. *Babbit Elecs. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) (citation omitted).

Plaintiff has therefore met its burden to establish that the corporate defendants engaged in unfair competition, but failed to meet its burden for Mr. Paynter. *Supra Section A*.

### C. Deceptive and Unfair Trade Practices

A claim for damages under Florida's Deceptive Trade Practices statute has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Wright v. Emory*, 41 So. 3d 290, 292 (Fla. 4th DCA 2010). Engaging in trademark infringement is an unfair and deceptive trade practice under this Section. *TracFone Wireless, Inc. v. Technopark Co., Ltd.*, 2012 U.S. Dist. LEXIS 58449, *19-20 (S.D. Fla. 2012) (citing *Sun Protection Factory, Inc. v. Tender Corp.*, 2005 U.S. Dist. LEXIS 35623 (M.D. Fla. 2005)).

Plaintiff has therefore met its burden to establish that the corporate defendants engaged in deceptive and unfair trade practice, but failed to meet its burden for Mr. Paynter. *Supra Section A*.

### D. Damages

Each of Plaintiff's three counts require that Plaintiff establish damages. Under the trademark law, a registrant whose rights are violated may generally recover the

defendant's profits from the infringing activity (or its own damages or both) together with costs of the action. The registrant may also be entitled to injunctive relief. 15 U.S.C. § 1117(a).

> In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

*Id.*

Proving the corporate defendants' sales is a difficult task in this case because Plaintiffs did not charge a fee for their karaoke shows or a fee to enter their establishment. The shows were an incident to their bar business. No reasonable calculations have been made which reliably track the percentage of the corporate defendants' bar sales which are linked to their karaoke performances. At Donovan's, karaoke is performed for 12.2% of their open hours. (Ex. 11). At Green Glass, karaoke is performed for 40.2 % of their open hours. *Id.* Plaintiff suggests that damages may be calculated by taking that portion of the corporate defendants' bar sales in proportion the

hours karaoke was available to customers.[9]  I find that this methodology is flawed and is not supported by the text of Section 1117(a).

Section 1117(a) requires Plaintiff to "prove defendants' sales." Plaintiff may have proven defendants' bar sales by a preponderance of the evidence. Plaintiff has not, however, traced those sales in a reliable way to karaoke performances. It is unreasonable to ascribe every liquor sale occurring in proportion to the hours when karaoke is playing to the karaoke performance itself.

Because defendants' profits are an unreliable measure of damages, I find that Plaintiff's own damages--its lost revenue--is the only reasonable approach. Plaintiff has sustained $9,585.00 in damages which represent the amount of lost revenue for a total of 426 discs at the wholesale price. I find that this is sum is justified and comports with the policies outlined in 15 U.S.C. § 1117(a)

I decline to enter an injunction against the future use of the Sound Choice mark because the boundaries of media shifting policy are ill defined and it would be difficult to fashion an injunction to comport with that policy. The defendants are now on notice that their use is subject to Plaintiff's scrutiny and are cautioned that their future actions must comply with applicable trademark laws.

---

[9] Plaintiff modifies the proportion that should be taken of defendants' total sales using handwritten notes/calculations made by Defendants. (Ex. 11, Ex. 8-10). There is no competent testimony as to the meaning of those calculations beyond that they represent the total sales of the corporate defendants and the proportion of hours that karaoke was available. I do not find that they are an admission by the defendants that a certain percentage of their sales are directly attributable to karaoke.

**IT IS ORDERED**:

1. Judgment is entered in favor of Defendant Robert L. Paynter, Sr. and against Plaintiff Slep-Tone Entertainment Corporation.  Plaintiff shall take nothing.

2. Judgment is entered in favor of Slep-Tone Entertainment Corporation and against Defendants Donovan's Reef Lounge & Package Store, Inc. and Green Glass Mall Inc. jointly and severally in the amount of $9,585.00.

**ORDERED** on July 17, 2012.

/S/ Richard Smoak
RICHARD SMOAK
UNITED STATES DISTRICT JUDGE

# EXHIBIT  2

*Filed 6/13/12*

Proposed Discovery Plan and Scheduling Order filed by the Hot Shots Defendants and the PTs Defendants in the case of *Slep-Tone Entertainment Corporation v. Ellis Island Casino & Brewery, et al.*, Case No. 2:12-cv-00239-KJD-RJJ, filed in the District of Nevada, Southern Division ("Las Vegas case").

# EXHIBIT  2

1  **Marquis Aurbach Coffing**
   TERRY A. COFFING, ESQ.
2  Nevada Bar No. 4949
   JOHN M. SACCO, ESQ.
3  Nevada Bar No. 1585
   BRIAN R. HARDY, ESQ.
4  Nevada Bar No. 10068
   10001 Park Run Drive
5  Las Vegas, Nevada 89145
   Telephone: (702) 382-0711
6  Facsimile: (702) 382-5816
   tcoffing@maclaw.com
7  bhardy@maclaw.com
   Attorneys for Hot Shots Bar and Grill,
8  The Pub, LLC, Joe, Dan, Decatur Restaurant & Tavern, DDRT, LLC,
   Starmaker Karaoke, Debbie Harm, Café Moda;
9  Café Moda, LLC and William Carney

10

11                    **UNITED STATES DISTRICT COURT**

12                        **DISTRICT OF NEVADA**

13  SLEP-TONE ENTERTAINMENT
    CORPORATION,
14                                          Case No.:      2:12-cv-00239-KJD-RJJ

15                     Plaintiff,

16       vs.

17
    ELLIS ISLAND CASINO & BREWERY;
18  FAME OPERATING COMPANY, INC.; HOT
    SHOTS BAR AND GRILL (a/k/a KELLEY'S
19  PUB); THE PUB, LLC; JOE; DAN; BIG      **PROPOSED DISCOVERY**
    NAILS, LLC; BEAUTY BAR; CAFÉ MODA;    **PLAN/SCHEDULING ORDER**
20  CAFÉ MODA, LLC; WILLIAM CARNEY;
    LAS VEGAS DJ SERVICE; JONNY VALENTI;
21  E STRING HRILL & POKER BAR; PCA        ***SPECIAL SCHEDULING***
    TRAUTH, LLC; KARAOKE LAS VEGAS;       ***REVIEW REQUESTED***
22  JACK GREENBACK; BILL'S GAMBLIN'
    HALL & SALOON; CORNER INVESTMENT
23  COMPANY, LLC; IMPERIAL PALACE
    HOTEL & CASINO; HARRASH'S IMPERIAL
24  PALACE CORPORATION; ROLL 'N'
    MOBILE DJ'S AND KARAOKE TOO;
25  KENNY ANGEL; PT'S PLACE; GOLDEN-
    PT'S PUB CHEYENNE-NELLIS 5, LLC; PT'S
26  PUB; GOLDEN-PT'S PUB WEST SAHARA 8,
    LLC; PT'S GOLD; GOLDEN-PT'S PUB
27  CENTENNIAL 32, LLC; GOLDEN PT'S PUB
    STEWART-NELLIS 2, LLC; FOLDEN
28  TAVERN GROUP, LLC; STEVE & RAY

*MARQUIS AURBACH COFFING*
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

M&A:08732-020 1698657_1.DOC 6/13/2012 11:25 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  KARAOKE; STEVE; RAY; LEGENDS
   CASINO; PUGDAWIGS, LLC; STARMAKER
2  KARAOKE DEBBIE HARMS; DECATUR
   RESTAURANT & TAVERN; DDRT, LLC;
3  PUTTERS; LISA/CARRISON LTR; DJ TARA
   KING PRODUCTIONS; TARA KING; KIXX
4  BAR; BOULDER STATION CASINO; NP
   BOULDER, LLC; NPPALACE, LLC; PALACE
5  STATION; DANSING KARAOKE; KIRK;
   GILLEY'S LAS VEGAS; TREASURE
6  ISLAND; TREASURE ISLAND, LLC; HALF
   SHELL SEAFOOD AND GAMIN; HALF
7  SHELL, LLC; JAMES BELLAMY; MEGA-
   MUSIC PRODUCTIONS; MR. D'S SPORTS
8  BAR; SPORTS BAR, LLC; RICK
   DOMINGUEZ; SOUND SELECT; ISLAND
9  GRILL; OFFICE 7 LOUNGE &
   RESTAURANT, INC.; JAKE'S BAR; DOC, G.
10 & G., INC.; MIKE CORRAL; DAVE CORRAL;
   SHOWTYME KARAOKE & DJ; CALICO
11 JACK'S SALOON; MIKE R. GORDON; RED
   LABEL LOUNGE; RED LABEL BAR, INC.;
12 TERRY CICCI; TERRY-OKE KARAOKE;
   KJ'S BAR & GRILL; L.T. BOND, INC.; TIM
13 MILLER; VISION & SOUND
   ENTERTAINMENT; THUNDERBIRD
14 LOUNGE AND BAR; ARUBA HOTEL AND
   SPA; IRVINGTON PROPERTIES, LLC;
15 THUNDERBIRD BAR & LOUNGE, LLC;
   AUDIO THERAPY DJ; MATTE McNULTY
16 (a/k/a DJ Matte); AUDIO THERAPY; GSTI
   HOLDING, LLC; GOLD SPIKE HOTEL &
17 CASINO; GOLD SPIKE HOLDINGS, LLC;
   MARDI GRAS LOUNGE-BEST WESTERN;
18 THE NEVADIAN, LLC; BEST WESTERN
   MARDI GRAS INN; J.P.P.J. OF NEVADA,
19 INC.; HARRAH'S LAS VEGAS; CAESAR'S
   ENTERTAINMENT CORPORATION; TJ'S
20 ALL-STARK KARAOKE; JOHN MENNITI;
   and JOHN DOES NOS. 1-10 INCLUSIVE,
21 IDENTITIES UNKNOWN,

22
                    Defendants.
23

24          **PROPOSED DISCOVERY PLAN/SCHEDULING ORDER**

25       Pursuant to Local Rule 26-1, the parties submit the following Discovery Plan and

26  Scheduling Order.

27  **I.      INFORMATION PURSUANT TO FRCP 26(F).**

28       1.      The first Defendants filed a Motion to Dismiss on March 16, 2012 [#13].

M&A:08732-020 1698657_1.DOC 6/13/2012 11:25 AM

2.     Pursuant to FRCP 26(f) the counsel for the plaintiff shall initiate the scheduling of a meeting within thirty (30) days after the first defendant answers or otherwise appears. To date, no meeting has been held or scheduled by the Plaintiff. Nevertheless, the instant parties are submitting the instant proposed discovery plan/scheduling order pursuant to the order of this Court.

3.     The parties have not exchanged their initial disclosure statements.

4.     Discovery may be conducted on all matters relevant to issues raised by subsequent pleadings and all matters otherwise within the scope of Rule 26(b)(1) and not protected from disclosure.

5.     No changes in limitations set by either the Federal Rules of Civil Procedure or Local Rules of Practice for the District of Nevada are requested at this time.

6.     No orders are requested to be entered pursuant to FRCP 16(b), 16(c) or 26(c) at this time.

7.     **Special Scheduling Review Requested**: Defendants Hot Shots Bar and Grill, The Pub, LLC, Joe, Dan, Decatur Restaurant & Tavern, DDRT, LLC, Starmaker Karaoke, Debbie Harm ("Hot Shot Defendants") filed their Motion to Dismiss to Plaintiff's Complaint on April 12, 2010. [#46]. Defendants Café Moda; Café Moda, LLC and William Carney ("Café Moda Defendants") filed there joinder thereto on April 26, 2012. [#54]. Plaintiff's filed an untimely opposition on to #46 on May 10, 2012. [#65]. Because of a multiple pending motions to dismiss, some Defendants (including the Café Moda Defendants) have yet to file an answer. As such, the instant parties respectfully request that this Court forgive their failure to file a Proposed Discovery Plan and Scheduling Order and allow discovery to close beyond the 180 days required by Local Rule 26-1(e)(1) as outlined below.

II.     **INFORMATION PURSUANT TO LOCAL RULE 26-1(E).**

1.     **Discovery Cutoff Date:**

The last day of discovery shall be one year from the date of filing of the Complaint or on or before February 18, 2013.

M&A:08732-020 1698657_1.DOC 6/13/2012 11:25 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    **2.    Amending the Pleadings and Adding Parties:**

2         In accordance with Local Rule 26-1(e)(2), the last day to file a motion to amend the

3    pleadings or to add parties shall be November 16, 2012.

4    **3.    Experts:**

5         In accordance with Local Rule 26-1(e)(3), the last day for disclosures as required by

6    FRCP 26(a)(2)(c) concerning experts shall be December 18, 2012.  The last day for disclosures

7    concerning rebuttal experts shall be January 18, 2012.

8    **4.    Dispositive Motions:**

9         In accordance with Local Rule 26-1(e)(4), the last day for filing dispositive motions

10   including, but not limited to motions for summary judgment, shall be March 18, 2013.

11   **5.    Pretrial Order:**

12        In accordance with Local Rule 26-1(e)(5), the last day to file a Joint Pretrial Order,

13   including any disclosures pursuant to FRCP 26(a)(3), shall be April 18, 2012.   In the event

14   dispositive motions are filed, the date for filing the Joint Pretrial Conference shall be suspended

15   until thirty (30) days after decision on the dispositive motion or upon further Order by the Court

16   extending the time period in which to file the Joint Pretrial Order.

17   **III.   EXTENSION OF SCHEDULED DEADLINES.**

18        In accordance with Local Rule 26-4, a request for an extension of this discovery plan

19   shall be filed and served no later than twenty (20) days before the discovery cut off date.

20        DATED this 13th day of June, 2012.

21                                         **MARQUIS AURBACH COFFING**

22                                         By: _/s/ Brian R. Hardy_
                                                TERRY A. COFFING, ESQ.
23                                              Nevada Bar No. 4949
                                                JOHN M. SACCO, ESQ.
24                                              Nevada Bar No. 1585
                                                BRIAN R. HARDY, ESQ.
25                                              Nevada Bar No. 10068
                                                10001 Park Run Drive
26                                              Las Vegas, Nevada  89145
                                                *Attorneys for Hot Shots Bar and Grill,*
27                                              *The Pub, LLC, Joe, Dan, Starmaker*
                                                *Karaoke, Debbie Harm, Café Moda;*
28                                              *Café Moda, LLC and William Carney*

1         IT IS SO ORDERED this _____ day of _____, 2012.

2

3

4                   _____

5                   UNITED STATES DISTRICT COURT JUDGE

6

7

8

9

10

11

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 5 of 5

# EXHIBIT 3

*Filed 6/19/12*

Proposed Discovery Plan and Scheduling Order filed by the Hot Shots Defendants and the PTs Defendants in the case of *Slep-Tone Entertainment Corporation v. Ellis Island Casino & Brewery, et al.*, Case No. 2:12-cv-00239-KJD-RJJ, filed in the District of Nevada, Southern Division ("Las Vegas case").

# EXHIBIT 3

1   Mark G. Tratos (Nevada Bar No. 1086)
    Lauri S. Thompson (Nevada Bar No. 6846)
2   Peter H. Ajemian (Nevada Bar No. 9491)
    GREENBERG TRAURIG, LLP
3   3773 Howard Hughes Parkway
    Suite 400 North
4   Las Vegas, Nevada 89169
    Telephone: (702) 792-3773
5   Facsimile: (702) 792-9002

6
    Counsel for Defendants
7

8                    UNITED STATES DISTRICT COURT

9                         DISTRICT OF NEVADA

10  SLEP-TONE ENTERTAINMENT
    CORPORATION,                              Case No. 2:12-cv-00239-KJD-RJJ
11
                    Plaintiff,                [PROPOSED] DISCOVERY PLAN
12                                            AND SCHEDULING ORDER BY
    vs.                                       DEFENDANTS PT'S PLACE;
13                                            GOLDEN-PT'S PUB CHEYENNE-
    ELLIS ISLAND CASINO & BREWERY,  et        NELLIS 5, LLC; PT'S PUB; GOLDEN-
14  al.,                                      PT'S PUB WEST SAHARA 8, LLC;
                                              PT'S GOLD; GOLDEN-PT'S PUB
15                  Defendants.               CENTENNIAL 32, LLC; GOLDEN-PT'S
                                              PUB STEWART-NELLIS 2, LLC; AND
16                                            GOLDEN TAVERN GROUP, LLC

17

18          Pursuant to Federal Rule of Civil Procedure 26(f) and Local Rule 26-1, Defendants

19  PT'S PLACE; GOLDEN-PT'S PUB CHEYENNE-NELLIS 5, LLC; PT'S PUB; GOLDEN-PT'S

20  PUB WEST SAHARA 8, LLC; PT'S GOLD; GOLDEN-PT'S PUB CENTENNIAL 32, LLC;

21  GOLDEN-PT'S PUB STEWART-NELLIS 2, LLC; GOLDEN TAVERN GROUP, LLC

22  (collectively "PT's Defendants") hereby submit to the Court the following proposed

23  discovery plan and scheduling order.

24          1. Meeting. Pursuant to FRCP 26(f), counsel for plaintiff shall initiate the scheduling

25  of a meeting within thirty (30) days after the first defendant answers or otherwise appears.

26  The first defendants filed a Motion to Dismiss on March 16, 2012 [docket no. 13].  To date,

27  no meeting has been scheduled or held by Plaintiff.  Pursuant to the Court Order, the PT's

28  Defendants are submitting this proposed discovery plan and scheduling order.

                                          1.

Greenberg Traurig, LLP
Suite 400 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

1     2.   Pre-Discovery Disclosures.   The parties have not exchanged their initial

2 disclosure statements.

3     3.  Discovery Plan. The PT's Defendants submit that all discovery in this case will

4 be conducted in accordance with the Federal Rules of Civil Procedure. The parties differ in

5 their opinion as to the time needed for the completion of discovery and request the

6 assistance of the Court to determine appropriate discovery deadlines. The PT's

7 Defendants filed their Motion to Dismiss on March 16, 2012 [docket no. 13] and their

8 Motion to Sever on May 11, 2012 [docket no. 68]. Plaintiff filed their opposition to the PT's

9 Defendants' Motion to Dismiss on April 10, 2012 [docket no. 43] and their opposition to the

10 PT's Defendants' Motion to Sever on May 31, 2012 [docket no. 75].

11     The parties propose the following discovery overview, discovery plan and cutoff

12 dates:

13     (a)  Discovery Cut-off Date. Due to the PT's Defendants' pending motions, the PT's

14 Defendants have yet to file an answer to the Complaint. A hearing date for the Motion to

15 Dismiss and Motion to Sever has not been set by the Court. The PT's Defendants propose

16 the discovery cut-off date be set for 180 days from the date of this Court's decision on their

17 pending Motion to Dismiss and Motion to Sever.

18     (b)  Amending the Pleadings and Adding Parties. The PT's Defendants propose the

19 last date for filing motions to amend the pleadings or to add parties shall be 90 days prior to

20 the close of fact discovery.

21     (c)   Expert Discovery. The PT's Defendants propose the deadline for disclosing

22 initial expert witnesses shall be 60 days prior to the close of fact discovery. The PT's

23 Defendants propose the deadline for disclosing rebuttal expert witnesses shall be 30 days

24 after the date to disclose initial experts.

25     (d) Dispositive Motions: The PT's Defendants propose that dispositive motions shall

26 be filed at least 30 days after the close of discovery.

27     (e)  Joint Pretrial Order. The PT's Defendants propose the Joint Pretrial Order shall

28 be filed 30 days after the deadline for filing dispositive motions. However, if dispositive

Greenberg Traurig, LLP
Suite 400 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

2.

1  motions have been filed, the Joint Pretrial Order shall be due thirty days after a decision or

2  by further order of the Court. Disclosures under Rule 26(a)(3) of the Federal Rules of Civil

3  Procedure and any objections thereto shall be included in the Joint Pretrial Order.

4          DATED this 19th day of June, 2012.

5                                        Respectfully submitted,

6                                        GREENBERG TRAURIG, LLP

7                                        By:   /s/ Lauri S. Thompson          .

8                                        MARK G. TRATOS, ESQ.
                                         Nevada Bar No. 1086
9                                        Lauri S. Thompson, Esq.
                                         Nevada Bar No. 6846
10                                       PETER H. AJEMIAN, ESQ.
                                         Nevada Bar No. 9491
11                                       GREENBERG TRAURIG, LLP
                                         3773 Howard Hughes Pkwy., Ste 400 North
12                                       Las Vegas, Nevada 89169

13                                       *Counsel for PT's Defendants*

14
    IT IS SO ORDERED:
15

16      _____
17      UNITED STATES MAGISTRATE JUDGE

18      Dated: _____

19

20

21

22

23

24

25

26

27

28

                                         3.

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on June 19, 2012, I served the foregoing **[PROPOSED]**

3 **DISCOVERY PLAN AND SCHEDULING ORDER BY DEFENDANTS PT'S PLACE;**

4 **GOLDEN-PT'S PUB CHEYENNE-NELLIS 5, LLC; PT'S PUB; GOLDEN-PT'S PUB WEST**

5 **SAHARA 8, LLC; PT'S GOLD; GOLDEN-PT'S PUB CENTENNIAL 32, LLC; GOLDEN-**

6 **PT'S PUB STEWART-NELLIS 2, LLC; AND GOLDEN TAVERN GROUP, LLC** via the

7 Court's CM/ECF filing system to all counsel of record and parties as listed.

8

9    /s/   Cynthia L. Ney
An employee of GREENBERG TRAURIG, L

10

11

Greenberg Traurig, LLP
Suite 400 North, 3773 Howard Hughes Parkway
Las Vegas, Nevada 89109
(702) 792-3773
(702) 792-9002 (fax)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4.

# EXHIBIT 4

Affidavit of Joe Gaytan in Support of Motion to Dismiss

# EXHIBIT 4

# AFFIDAVIT OF JOE GAYTAN IN SUPPORT OF MOTION TO DISMISS

STATE OF ILLINOIS          )
                              ) ss.
COUNTY OF KANE          )

I, Joe Gaytan, being duly sworn, depose and say:

1. I am a defendant in case of Slep-Tone Entertainment Corporation, et al. v. Diane Klemz, et al. Case No. 14-cv-189, filed in the United States District Court, District of Northern Illinois, am over the age of eighteen years, am competent to make this declaration based on my own personal knowledge and have done so of my own free will, and I could testify as to the facts contained herein under oath in a court of law if called upon to do so.

2. I am not in possession of any Sound Choice discs. However, vast majority Sound Choice discs do not have a "TM" or "®" symbol following the Sound Choice logo on the face of the disc, and none of the Sound Choice discs that I have seen have the TM or ® mark next to the Sound Choice logo when the disc is actually played, and the Sound Choice logo is displayed on a television screen.

3. Sound Choice discs do contain a warning of a different nature which, if followed to the letter, would not allow for any karaoke performance at any public venue. Such "karaoke shows" are now, and have always been, Slep-Tone's and all other karaoke disc manufactures' bread and butter as the shows introduce people to karaoke, and most karaoke discs are sold to KJs specifically for that purpose. The warning states,

> WARNING: THIS MATERIAL IS PROTECTED BY FEDERAL COPYRIGHT LAWS, UNAUTHORIZED DUPLICATION, PUBLIC PERFORMANCE, OR BROADCAST IS A VIOLATION OF APPLICABLE LAWS. THESE ARE PROFESSIONAL RE-CREATIONS AND NOT RENDITIONS BY THE ORIGINAL ARTIST.

4. Sound Choice has a safe harbor website at www.scsafehabor.com. Some of the quotes from the Sound Choice safe harbor website are as follows:
If you ae playing directly from original Sound Choice discs, you ar operating legally, from Sound Choice's perspective. We can't speak for other parties, such as other producers, music publishers, or ASCAP/BMI/SESAC.
* * * *

We will use the information you provide us to verify that you are operating legally--or, if not, to help you get legal and square with our policies. We may also use that information against you in a lawsuit, if that becomes necessary. We may also use your information to notify you about developments in the karaoke industry that you might be interested in, or, with your permission, to tell you about karaoke products you might want to buy.
* * * *

**Dose signing up guarantee I won't get sued?**
No. The safe harbor applies to non-owner venues, not to hosts. *See* www.scsafeharbor.com/hostfaq.php.
* * * *

If you don't want to play from CDs, we understand. A large collection of CDs takes up a lot of space. Bringing your CDs to a venue exposes them to theft and loss. CDs can get scratched from too much

handling. If you choose the convenience of a hard drive system, we understand the technical reasons for doing so. But, let's be clear: For legal reasons, Sound Choice does not authorize the use of hard drive systems to play our karaoke music commercially. But we will agree not to sue you for "media-shifting" the contents of our CD+Gs or MP3+G discs if you follow our media-shifting policy. *See* www.scsafeharbor.com/stayinglegal.php.

5. In a response to a Sound Choice hate site, www.soundchoicesucks.com, Kurt Slep, the CEO of Slep-Tone Entertainment Corporation and Sound Choice, wrote:

> IN ALL CASES, we have more evidence than is named or given in our complaints - but there is not a need to show our hand in our legal filings. The opposing party can ask to see that evidence during their depositions if they decide to fight. However, we cannot legally file without legitimate legal grounds and for those whose OPINION is that we don't, if you are named in a future suit, you can follow that tact at your own risk. We do not need to have all details on an individual before filing and/or serving someone - the clerk of court's office has resources at its disposal for finding people when it comes time to serve them. If you are really interested in our methodology, we are trying to keep our costs low so that we can keep your settlement costs low. But we are following local laws in all of our actions, although we are filing in Federal court, since Trademark infringement is a Federal offense.
>
> * * * *
>
> We do not have the rights from the Music Publishers (who represent the song writers) to grant the transfer of our music from the CDG to a hard drive, that is why we have not licensed "hard drives" per se. HOWEVER, we are willing to not take action (although, nor indemnify) a KJ who chooses to do so for reasons of ease of operation PROVIDED THAT HE HAS A LEGALLY PURCHASED DISC FOR EACH AND EVERY SONG ON EACH AND EVERY HARD DRIVE (or CAVS type ) SYSTEM. That is what we (and KIAA) are referring to as "1:1".
>
> * * * *
>
> If any of you have followed recent court cases filed by the RIAA against file sharers, you have seen average settlements in the range of $80,000 PER SONG, which is still only about half the maximum for copyright infringement. Trademark is $200,000 per mark with that going up to $2,000,000 for willful infringement. And these cases were against home users; in our suits, there is commercial use of our IP, thus very few "personal" protections and higher penalties – there is no "fair use" provision for commercial use of federally protected intellectual property rights....

*See* www.soundchoicesucks.blogspot.com/2010/02/statement-from-sound-choiceceo-kurt.html.

Further Affiant Sayeth Naught.

**Dated** this 27TH day of FEBRURY, 2014.

Joe Gaytan

SUBSCRIBED and SWORN to before me this 27th day of FEBRUARY, 2014.

NOTARY PUBLIC in and for said COUNTY and STATE

"OFFICIAL SEAL"
Blanca A. Arredondo
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 02/13/2017

# EXHIBIT 5

Complaint in the Las Vegas Case No. 2:12-cv-00239-KJD-RJJ

# EXHIBIT 5

1     Donna Boris (California SBN 153033)
       Verified Petition to be filed within 45 days
2     donna@borislaw.com
       Boris & Associates
3     9107 Wilshire Blvd., Suite 450
       Beverly Hills, CA 90210
4     (310) 492-5962 ♦ (310) 388-5920 facsimile
5
6     Kerry P. Faughnan (Nevada SBN 12204)
       kerry.faughnan@gmail.com
       Law Offices of Kerry Faughnan
7     P.O. Box 335361
       North Las Vegas, NV 89033
8     (702) 301-3096 ♦ (702) 331-4222 facsimile
9
       Attorneys for Plaintiff
10    Slep-Tone Entertainment Corporation

11                UNITED STATES DISTRICT COURT

12                   DISTRICT OF NEVADA

13

| | |
|---|---|
| 14   SLEP-TONE ENTERTAINMENT CORPORATION, | Case No.: |
| 15         Plaintiffs, | **COMPLAINT FOR:** |
| 16   v. | **(1) TRADEMARK INFRINGEMENT** 15 U.S.C. § 1114 |
| 17   ELLIS ISLAND CASINO & BREWERY; FAME OPERATING COMPANY, INC.; | **(2) LANHAM ACT UNFAIR COMPETITION** 15 U.S.C. § 1125 |
| 18   HOT SHOTS BAR AND GRILL (a/k/a KELLEY'S PUB); THE PUB, LLC; JOE; | |
| 19   DAN; BIG NAILS, LLC; BEAUTY BAR; CAFÉ MODA; CAFÉ MODA, LLC; | |
| 20   WILLIAM CARNEY; LAS VEGAS DJ SERVICE; JOHNNY VALENTI; E | |
| 21   STRING GRILL & POKER BAR; PCA TRAUTH, LLC; KARAOKE LAS VEGAS; | **Jury Trial Demanded** |
| 22   JACK GREENBACK; BILL'S GAMBLIN' HALL & SALOON; CORNER | |
| 23   INVESTMENT COMPANY, LLC; IMPERIAL PALACE HOTEL & CASINO; | |
| 24   HARRAH'S IMPERIAL PALACE CORPORATION; ROLL 'N' MOBILE | |
| 25   DJ'S AND KARAOKE TOO; KENNY ANGEL; PT'S PLACE; GOLDEN-PT'S | |

1  PUB CHEYENNE-NELLIS 5, LLC; PT'S
   PUB; GOLDEN-PT'S PUB WEST
2  SAHARA 8, LLC; PT'S GOLD; GOLDEN-
   PT'S PUB CENTENNIAL 32, LLC;
3  GOLDEN-PT'S PUB STEWART-NELLIS
   2, LLC; GOLDEN TAVERN GROUP,
4  LLC; STEVE & RAY KARAOKE; STEVE;
   RAY; LEGENDS CASINO; PUGDAWGS,
5  LLC; STARMAKER KARAOKE; DEBBIE
   HARMS; DECATUR RESTAURANT &
6  TAVERN; DDRT, LLC; PUTTERS;
   LISA/CARRISON LTD; DJ TARA KING
7  PRODUCTIONS; TARA KING; KIXX
   BAR; BOULDER STATION CASINO; NP
8  BOULDER, LLC; NPPALACE, LLC;
   PALACE STATION; DANSING
9  KARAOKE; KIRK; GILLEY'S LAS
   VEGAS; TREASURE ISLAND;
10 TREASURE ISLAND, LLC; HALF SHELL
   SEAFOOD AND GAMING; HALF
11 SHELL, LLC; JAMES BELLAMY;
   MEGA-MUSIC PRODUCTIONS; MR. D'S
12 SPORTS BAR; SPORTS BAR, LLC; RICK
   DOMINGUEZ; SOUND SELECT;
13 ISLAND GRILL; OFFICE 7 LOUNGE &
   RESTAURANT, INC.; JAKE'S BAR;
14 DOC, G. & G., INC.; MIKE CORRAL;
   DAVE CORRAL; SHOWTYME
15 KARAOKE & DJ; CALICO JACK'S
   SALOON; MIKE R. GORDON; RED
16 LABEL LOUNGE; RED LABEL BAR,
   INC.; TERRY CICCI; TERRY-OKE
17 KARAOKE; KJ'S BAR & GRILL; L.T.
   BOND, INC.; TIM MILLER; VISION &
18 SOUND ENTERTAINMENT;
   THUNDERBIRD LOUNGE AND BAR;
19 ARUBA HOTEL AND SPA; IRVINGTON
   PROPERTIES, LLC; THUNDERBIRD
20 BAR & LOUNGE, LLC; AUDIO
   THERAPY DJ; MATTE McNULTY (a/k/a
21 "DJ Matte"); AUDIO THERAPY;GSTI
   HOLDINGS, LLC; GOLD SPIKE HOTEL
22 & CASINO; GOLD SPIKE HOLDINGS,
   LLC; MARDI GRAS LOUNGE – BEST
23 WESTERN; THE NEVADIAN, LLC;
   BEST WESTERN MARDI GRAS INN;

(line numbers 1-25 at left)

1  J.P.P.J. OF NEVADA, INC.;  HARRAH'S
   LAS VEGAS; CAESAR'S
2  ENTERTAINMENT CORPORATION;
   TJ'S ALL-STAR KARAOKE; JOHN
3  MENNITI; and JOHN DOES NOS. 1-10
   INCLUSIVE, IDENTITIES UNKNOWN,
4
5          Defendants.
6
7          The Plaintiff, SLEP-TONE ENTERTAINMENT CORPORATION ("SLEP-TONE"), by

8  its undersigned counsel, complains of the Defendants and for its complaint alleges as follows:

9                          **JURISDICTION AND VENUE**

10         1.      This is an action for trademark infringement and unfair competition arising under

11  §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125. This Court has

12  exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that

13  this is a civil action arising under the laws of the United States.  This Court also has jurisdiction

14  pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating

15  to trademarks, and, as to the Plaintiff's Lanham Act unfair competition claim, pursuant to 28

16  U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the

17  trademark laws of the United States.

18         2.      Venue is proper in this District in that all defendants reside in Nevada and at least

19  one defendant resides in this District. Venue is also proper in this District because a substantial

20  part of the events or omissions giving rise to the claim occurred in this District.

21                          **THE PLAINTIFF**

22         3.      Plaintiff SLEP-TONE is a North Carolina corporation having its principal place

23  of business at 14100 South Lakes Drive, Charlotte, North Carolina.

24  ///

25  ///

- 3 -

**THE DEFENDANTS**

4.      Defendants ELLIS ISLAND CASINO & BREWERY and FAME OPERATING COMPANY, INC. have their principal business address in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

5.      Defendants THE PUB, LLC and HOT SHOTS BAR AND GRILL (a/k/a KELLEY'S PUB) and Defendants JOE and DAN have their principal business address in Las Vegas, Nevada, and operate eating and drinking establishment(s) at which karaoke entertainment is provided by Defendants JOE and DAN.

6.      Defendants BIG NAILS, LLC and BEAUTY BAR have their principal business address in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

7.      Defendants CAFÉ MODA, CAFÉ MODA, LLC and WILLIAM CARNEY have their principal business address in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

8.      Defendants LAS VEGAS DJ SERVICE and JOHNNY VALENTI (a/k/a "Johnny V") have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

9.      Defendants E STRING GRILL & POKER BAR and PCA TRAUTH, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

10.     Defendants KARAOKE LAS VEGAS and JACK GREENBACK have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

- 4 -

11.     Defendants BILL'S GAMBLIN' HALL & SALOON and CORNER INVESTMENT COMPANY, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

12.     Defendants IMPERIAL PALACE HOTEL & CASINO and HARRAH'S IMPERIAL PALACE CORPORATION have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

13.     Defendants ROLL 'N' MOBILE DJ'S AND KARAOKE TOO and KENNY ANGEL have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

14.     Defendants PT'S PLACE and GOLDEN-PT'S PUB CHEYENNE-NELLIS 5, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

15.     Defendants PT'S PUB and GOLDEN-PT'S PUB WEST SAHARA 8, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

16.     Defendants PT'S GOLD and GOLDEN-PT'S PUB CENTENNIAL 32, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

17.     Defendants PT'S PLACE and GOLDEN-PT'S PUB STEWART-NELLIS 2, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

/ / /

/ / /

- 5 -

18. Defendants PT'S PUB and GOLDEN TAVERN GROUP, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

19. Defendants STEVE & RAY KARAOKE and STEVE and RAY have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

20. Defendants LEGENDS CASINO and PUGDAWGS, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

21. Defendants STARMAKER KARAOKE and DEBBIE HARMS have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

22. Defendants DECATUR RESTAURANT & TAVERN and DDRT, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

23. Defendants PUTTERS and LISA/CARRISON LTD have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

24. Defendants DJ TARA KING PRODUCTIONS and TARA KING have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

25. Defendants KIXX BAR, BOULDER STATION CASINO and NP BOULDER, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

///

-6-

26. Defendants JACK'S IRISH PUB, NP PALACE, LLC and PALACE STATION have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

27. Defendants DANSING KARAOKE and KIRK (a/k/a "The Urban Cowboy – DJ" and "DJ Captain Kirk") have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

28. Defendants GILLEY'S LAS VEGAS, TREASURE ISLAND and TREASURE ISLAND, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

29. Defendants HALF SHELL SEAFOOD AND GAMING and HALF SHELL, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

30. Defendants JAMES BELLAMY and MEGA-MUSIC PRODUCTIONS have their principal business address in Las Vegas, Nevada and are engaged in the business of providing karaoke entertainment at multiple venues in this State.

31. Defendants MR. D'S SPORTS BAR and SPORTS BAR, LLC have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

32. Defendants RICK DOMINGUEZ (a/k/a "Rick D") and SOUND SELECT are engaged in the business of providing karaoke entertainment at multiple venues in this State.

33. Defendants ISLAND GRILL and OFFICE 7 LOUNGE & RESTAURANT, INC. have their principal place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

///

1       34.    Defendants JAKE'S BAR and DOC, G. & G., INC. have their principal place of

2   business in Las Vegas, Nevada and operate eating and drinking establishment(s) at which

3   karaoke entertainment is provided.

4       35.    Defendants MIKE CORRAL, DAVE CORRAL (a/k/a "Crazy Dave" and "Mad

5   Mike"), and SHOWTYME KARAOKE & DJ have their principal business address in Las

6   Vegas, Nevada and are engaged in the business of providing karaoke entertainment at venue(s)

7   in this State.

8       36.    Defendants CALICO JACK'S SALOON and MIKE R. GORDON have their

9   principal place of business in Las Vegas, Nevada and operate eating and drinking

10  establishment(s) at which karaoke entertainment is provided.

11      37.    Defendants RED LABEL LOUNGE and RED LABEL BAR, INC. have their

12  principal place of business in Las Vegas, Nevada and operate eating and drinking

13  establishment(s) at which karaoke entertainment is provided.

14      38.    Defendants TERRY CICCI and TERRY-OKE KARAOKE have their principal

15  business address in Las Vegas, Nevada and are engaged in the business of providing karaoke

16  entertainment at multiple venues in this State.

17      39.    Defendants KJ'S BAR & GRILL AND L.T. BOND, INC. have their principal

18  place of business in Las Vegas, Nevada and operate eating and drinking establishment(s) at

19  which karaoke entertainment is provided.

20      40.    Defendants TIM MILLER (a/k/a "Diamond Tim") and VISION & SOUND

21  ENTERTAINMENT have their principal business address in Las Vegas, Nevada and are

22  engaged in the business of providing karaoke entertainment at venue(s) in this State.

23      41.    Defendants THUNDERBIRD LOUNGE AND BAR; ARUBA HOTEL AND

24  SPA; IRVINGTON PROPERTIES, LLC and THUNDERBIRD BAR & LOUNGE, LLC have

25

1    their principal place of business in Las Vegas, Nevada and operate eating and drinking

2    establishment(s) at which karaoke entertainment is provided.

3         42.    Defendants AUDIO THERAPY and MATTE McNULTY (a/k/a "DJ Matte")

4    have their principal business address in Las Vegas, Nevada and are engaged in the business of

5    providing karaoke entertainment at multiple venues in this State using multiple karaoke systems.

6         43.    Defendants GOLD SPIKE HOTEL AND CASINO, GOLD SPIKE HOLDINGS,

7    LLC and GSTI HOLDINGS, LLC have their principal place of business in Las Vegas, Nevada

8    and operate eating and drinking establishment(s) at which karaoke entertainment is provided.

9         44.    Defendants MARDI GRAS LOUNGE – BEST WESTERN and THE

10   NEVADIAN, INC. have their principal place of business in Las Vegas, Nevada and operate

11   eating and drinking establishment(s) at which karaoke entertainment is provided.

12        45.    Defendants BEST WESTERN MARDI GRAS INN and J.P.P.J. OF NEVADA,

13   INC. have their principal place of business in Las Vegas, Nevada and operate eating and

14   drinking establishment(s) at which karaoke entertainment is provided.

15        46.    The true names and capacities, whether individual, corporate, associate, partner or

16   otherwise of Defendants named herein as Does 1 through 10 inclusive, are unknown to Plaintiff

17   at this time, and Plaintiff therefore sues these Defendants by such fictitious names. Plaintiff will

18   amend this Complaint to allege their true names and capacities when ascertained.

19                                 **BACKGROUND FACTS**

20        47.    Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks

21   sold under the name "Sound Choice." Slep-Tone was founded 25 years ago by Kurt and Derek

22   Slep, two brothers with a vision to nurture the development of karaoke in America as a

23   participatory entertainment phenomenon.

24   / / /

25   / / /

-9-

48.     Sound Choice is recognized as one of the leading producers of high quality karaoke accompaniment tracks. The company has invested over $18 million to re-record and replicate the authentic sound of popular music across different eras and genres of music.

49.     Slep-Tone's dedication to producing music of the highest quality and the most authentic character led to its music becoming the staple of almost every karaoke show in the country. As karaoke grew in popularity, Sound Choice became the brand that nearly every karaoke fan wanted to sing and that nearly every karaoke jockey ("KJ") wanted in his or her library.

50.     KJs play karaoke songs using compact disks containing files written in one of two special encoded formats, either "CD+G" ("compact disk plus graphics") or "MP3G" ("MP31 plus graphics"), in which the disk contains the music and the lyrics, which will display on a screen.

51.     In recent years, computer technology, cheap file memory devices, and the internet have made it possible for karaoke disks to be decoded and "ripped" (copied) to a user's hard drive and easily copied and distributed between KJs. This technology has proven irresistible to KJs, many of who have used this opportunity to copy one purchased disk to several different computer based systems, copy a singer's personal disks if they use them during a show, "swap" song files among each other, download them from illegal file sharing sites and build libraries of tens of thousands of karaoke songs without paying for them.

52.     Whereas in the past a KJ would buy multiple copies of an original disk if he or she desired to operate multiple systems, now they simply "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation.

---

[1]  MP3 is an acronym standing for "Moving Picture Experts Group Audio Layer 3." MP3G is a far newer format than CD+G and is significantly more portable than CD+G. The Plaintiff has only recently begun distributing its karaoke tracks in this format, and only under tight contractual controls that require user registration and audits, confine possession to professional karaoke operators, include serialization of licensed disks, and prohibit file sharing under pain of forfeiture of license rights.

Additionally, many KJs or operators starting in the business simply buy computer drives pre-loaded with thousands of illegally copied songs.

53.     These practices have become so widespread that Slep-Tone has been driven nearly out of business. At its peak, the Sound Choice family of companies employed 75 individuals and produced as many as 5 new karaoke disks per month. Today, the enterprise employs fewer than 10 individuals.

54.     Sound Choice Studios, Inc. which was SLEP-TONE's sister company, was responsible for recording new music for Karaoke. Sound Choice Studios, Inc. lost money on every recent new karaoke disk and was driven out of business because it could no longer profitably produce new music as illegally copying of its products has skyrocketed. The most recent new disk did not produce enough revenue even to cover the production and licensing costs associated with it—yet the songs from that disk can be found on as many as 30,000 karaoke systems around the United States. In the future, SLEP-TONE will have to subcontract to ex-employees of Sound Choice Studios, Inc. who purchased its assets, if/when it is able to profitably release new titles again.

55.     For KJs, karaoke is a commercial enterprise.

56.     Karaoke entertainment is provided as part of, and/or in conjunction with, the commercial enterprise of those persons and entities named herein who own and/or operate eating and drinking establishment(s).

57.     KJs who legitimately acquired all of their music at great cost are being forced by illicit competition to produce shows for lower and lower fees. Illegitimate competitors offer libraries of tens of thousands of songs, which would have cost $50,000 to $100,000 or more to acquire legitimately, but produce shows for one-third the rates a legitimate KJ can offer. The result is significant financial pressure on once-legitimate KJs to skirt or ignore the law and become pirates, simply to stay in business.

58.     Slep-Tone has been forced to undertake this litigation in order to ensure that it survives and continues to produce the high-quality karaoke music its fans demand and to level the playing field for the legitimate KJs.

59.     The term "karaoke" means "empty orchestra" in Japanese. Karaoke entertainment has grown into a multi-million dollar business in the United States.

60.     Karaoke compact disk plus graphics or MP3 plus graphics recordings contain re-created arrangements of popular songs for use as "accompaniment tracks." Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer. In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

61.     The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

62.     This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

63.     Entertainers who provide karaoke services in bars, restaurants, and other venues are known as karaoke jockeys ("KJs"), karaoke hosts, or karaoke operators. The services provided by KJs typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

/ / /

64.     Typically, a KJ will maintain a catalog of songs available for performance in order to aid participants in selecting a song to sing.

65.     Legitimate KJs purchase equipment and purchase or license compact disks containing accompaniment tracks and charge for the above-mentioned karaoke services.

66.     Many KJs, such as some of the present Defendants, obtain, copy, share, distribute and/or sell media-shifted copies of the accompaniment tracks via pre-loaded hard drives, USB drives, CD-R's, or the Internet.

67.     Some KJs copy the accompaniment tracks from compact discs to computer hard drives or other media, an activity known as "media-shifting."

68.     In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3G format or WAV+G format; this is referred to as "format-shifting."

69.     Both media-shifting and format-shifting involve the creation of copies of the original materials stored on the compact discs.

70.     Upon information and belief, and based upon investigation of their activities, the present Defendants are in possession of, and/or have used, authorized, or benefitted from the use and display of unauthorized media-shifted and format-shifted copies of karaoke accompaniment tracks which have been marked falsely with SLEP-TONE's federally registered trademarks.

71.     Neither SLEP-TONE nor any of its associated companies has ever authorized media-shifting or format-shifting of its accompaniment tracks for any commercial purpose. SLEP-TONE does, however, tolerate media-shifting and format-shifting under very specific conditions.

72.     SLEP-TONE's conditions for tolerance of media-shifting and format-shifting include, without limitation, that (a) that each media-shifted or format-shifted track must have originated from an original, authentic Sound Choice compact disc; (b) that the tracks from the

1    original, authentic Sound Choice compact disc be shifted to one, and only one, alternative

2    medium at a time; (c) that the KJ maintain ownership and possession of the original, authentic

3    Sound Choice compact disc for the entire time that the media-shifted or format-shifted tracks are

4    in existence; (d) that the original, authentic Sound Choice compact disc not be used for any

5    commercial purpose while its content has been shifted to the alternative medium; and (e) that the

6    KJ notify SLEP-TONE that he or she intends to conduct or has conducted a media-shift or

7    format-shift, and submits to a verification by a SLEP-TONE representative of adherence to

8    SLEP-TONE's policy.

9          73.    Media-shifting or format-shifting that occurs outside the conditions of tolerance

10    described above is entirely without authorization or tolerance.

11          74.    Each of the Defendants has used media-shifted and/or format-shifted karaoke

12    accompaniment tracks marked with the SLEP-TONE's registered trademarks for commercial

13    purposes.

14          75.    Without exception, the Defendants' media-shifting activities have been

15    undertaken outside the conditions of tolerance described above.

16          76.    A karaoke accompaniment track that exists outside the conditions of tolerance

17    described above and that has been marked with SLEP-TONE's federally registered trademarks is

18    a counterfeit.

19          77.    The copying, sharing, distribution, and selling of media-shifted and/or format-

20    shifted copies is not accompanied by the payment of any royalty to SLEP-TONE, nor authorized

21    by any license agreement.

22          78.    SLEP-TONE and its affiliated companies pay statutory and negotiated royalties to

23    the owners of copyright in the underlying musical works for their activities in legitimately

24    creating, copying, distributing, and selling compact disks containing karaoke accompaniment

25    tracks.

- 14 -

79.    Those persons, including the Defendants, who illegitimately obtain, copy, share, distribute, and/or sell media-shifted copies of the Plaintiff's accompaniment tracks do not pay royalties to the owners of copyright in the underlying musical works.

80.    SLEP-TONE and its affiliated companies have spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits, and building a brand that is one of the pre-eminent brands in the industry.

81.    The widespread creation of counterfeit copies of SLEP-TONE's karaoke disks has denied SLEP-TONE the benefit of its investments.

82.    These counterfeits include SLEP-TONE's registered trademarks, such that to the consumers of the illegitimate KJs' services, the counterfeits are virtually indistinguishable from genuine Sound Choice materials.

83.    For each of the several recent releases of new karaoke music by SLEP-TONE, dozens of illegitimate copies of the contents of the disk have been created, on average, for each legitimate copy sold. SLEP-TONE, its affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

84.    Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

85.    Widespread pirating of songs has contributed to the loss of more than sixty jobs at the Plaintiff's location in Charlotte, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

/ / /

/ / /

86. Legitimate KJs spend thousands of dollars acquiring SLEP-TONE's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

87. Illegitimate KJs, who acquire the songs in their libraries illegally, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of SLEP-TONE's tracks.

88. Piracy therefore unfairly increases the profits of illegitimate KJs and unfairly decreases the profits of legitimate KJs, a condition that pressures legitimate KJs to either commit piracy instead of doing business with SLEP-TONE and other karaoke music producers or lose their shows to KJs offering more songs at cheaper prices to the same venues.

89. Because of piracy, it is nearly impossible for legitimate KJs to compete against illegal KJs, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

90. Even when illegitimate KJs have been forced through legal action or agreement to destroy their counterfeit copies of the Plaintiff's tracks, the illegitimate KJs continue to engage in unfair competition using pirated materials belonging to other manufacturers.

91. This unfair competition harms the Plaintiff, despite the elimination of counterfeit copies of the Plaintiff's tracks, because the continuing piracy of other manufacturers' tracks exerts continuing pressure upon the Plaintiff's customers and potential customers to commit piracy of Plaintiff's tracks. Further the greater number of tracks on pirate systems makes it more difficult for legal hosts to get hired and thus have the revenue to purchase Plaintiff's products.

92. In order to build a large library of SLEP-TONE's accompaniment tracks, a legitimate KJ could expect to spend approximately $25,000 for each karaoke system upon which

- 16 -

1   that library would be used. For a comprehensive library of SLEP-TONE's accompaniment

2   tracks, that figure would rise to $40,000 or more.

3       93.     Venues such as those operated by the Defendants can enjoy significant savings by

4   turning a blind eye to the actions of the illegitimate KJs they hire.

5       94.     These venues benefit from piracy because unfair competition from pirate KJs

6   pressures legitimate KJs to accept lower compensation from the venues to obtain new business or

7   retain old business. By decreasing the fixed cost of entertainment, the Defendants' operations

8   become more profitable.

9                        **THE RIGHTS OF THE PLAINTIFF**

10      95.     Plaintiff SLEP-TONE is the owner of U.S. Trademark Registration No. 1,923,448

11  for the trademark SOUND CHOICE.

12      96.     Plaintiff SLEP-TONE is also the owner of U.S. Trademark Registration No.

13  2,000,725, for a display trademark as follows:



18      97.     Plaintiff Slep-Tone has, for the entire time its marks ("the Sound Choice Marks")

19  have been federally registered, provided the public, including the Defendants, with notice of its

20  federal registrations through the consistent display of the symbol ® with its marks as used.

21                        **ACTIVITIES OF DEFENDANTS**

22      98.     SLEP-TONE's investigators observed each of the Defendants possessing, using,

23  or authorizing or benefiting from unauthorized counterfeit copies of at least one work bearing the

24  Sound Choice Marks.

25

- 17 -

99. Defendants ELLIS ISLAND CASINO & BREWERY and FAME OPERATING COMPANY, INC. operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used. In connection with that show, Defendant ELLIS ISLAND CASINO & BREWERY and FAME OPERATING COMPANY, INC. repeatedly displayed the Sound Choice Marks without right or license.

100. Defendant ELLIS ISLAND CASINO & BREWERY and FAME OPERATING COMPANY, INC. has advertised or otherwise indicated that it is in possession of a library containing more than 100,000 tracks stored on its karaoke system.

101. Defendants HOT SHOTS BAR AND GRILL (a/k/a KELLEY'S PUB), THE PUB, LLC and Defendants JOE and DAN operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used. In connection with that show, Defendants HOT SHOTS BAR AND GRILL (a/k/a KELLEY'S PUB), THE PUB, LLC and Defendants JOE and DAN repeatedly displayed the Sound Choice Marks without right or license.

102. Defendants HOT SHOTS BAR AND GRILL (a/k/a KELLEY'S PUB), THE PUB, LLC and Defendants JOE and DAN have advertised or otherwise indicated that they are in possession of a library containing more than 100,000 tracks stored on their karaoke system.

103. Defendants BIG NAILS, LLC and BEAUTY BAR operate a karaoke system to produce a karaoke show at its eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

104. Upon information and belief, the karaoke system described in the preceding paragraph is directly owned by Defendants BIG NAILS, LLC and BEAUTY BAR.

105. In connection with that show, Defendants BIG NAILS, LLC and BEAUTY BAR repeatedly displayed the Sound Choice Marks without right or license.

- 18 -

106. Defendants BIG NAILS, LLC and BEAUTY BAR have advertised or otherwise indicated that they are in possession of a library containing more than 50,000 tracks stored on their karaoke system.

107. Defendants CAFÉ MODA, CAFÉ MODA, LLC and WILLIAM CARNEY operate a karaoke system to produce a karaoke show at their establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

108. Upon information and belief, the karaoke system described in the preceding paragraph is directly owned by Defendants CAFÉ MODA, CAFÉ MODA, LLC and WILLIAM CARNEY.

109. In connection with that show, Defendants CAFÉ MODA, CAFÉ MODA, LLC and WILLIAM CARNEY repeatedly displayed the Sound Choice Marks without right or license.

110. Defendants LAS VEGAS DJ SERVICE and JOHNNY VALENTI (a/k/a "Johnny V"), operate karaoke systems to produce karaoke shows at multiple eating and drinking establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

111. In connection with those shows, Defendants LAS VEGAS DJ SERVICE and JOHNNY VALENTI repeatedly displayed the Sound Choice Marks without right or license.

112. Defendants LAS VEGAS DJ SERVICE and JOHNNY VALENTI regularly perform karaoke shows in multiple eating and drinking establishments simultaneously.

113. Defendants LAS VEGAS DJ SERVICE and JOHNNY VALENTI have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

114. Defendant E STRING GRILL & POKER BAR and PCA TRAUTH, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

-19-

115.   In connection with those shows, Defendants E STRING GRILL & POKER BAR and PCA TRAUTH, LLC repeatedly displayed the Sound Choice Marks without right or license.

116.   Defendants E STRING GRILL & POKER BAR and PCA TRAUTH, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

117.   Defendants KARAOKE LAS VEGAS and JACK GREENBACK   operate a karaoke system to produce a karaoke show at multiple eating and drinking establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

118.   In connection with those shows, Defendants KARAOKE LAS VEGAS and JACK GREENBACK repeatedly displayed the Sound Choice Marks without right or license.

119.   Upon information and belief, Defendants KARAOKE LAS VEGAS and JACK GREENBACK perform regular karaoke shows in multiple eating and drinking establishments in this State using multiple karaoke systems. Defendants KARAOKE LAS VEGAS and JACK GREENBACK regularly perform karaoke shows in separate eating and drinking establishments simultaneously.

120.   Defendants   BILL'S   GAMBLIN'   HALL   &   SALOON   and   CORNER INVESTMENT COMPANY, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

121.   In connection with those shows, Defendants BILL'S GAMBLIN' HALL & SALOON and CORNER INVESTMENT COMPANY, LLC repeatedly displayed the Sound Choice Marks without right or license.

/ / /

/ / /

- 20 -

1   122.  Defendants BILL'S GAMBLIN' HALL & SALOON and CORNER

2   INVESTMENT COMPANY, LLC have advertised or otherwise indicated that they are in

3   possession of a library containing more than 200,000 tracks stored on their karaoke systems.

4   123.  Defendants IMPERIAL PALACE HOTEL & CASINO and HARRAH'S

5   IMPERIAL PALACE CORPORATION operate a karaoke system to produce a karaoke show at

6   their eating and drinking establishment in which counterfeit copies of SLEP-TONE's

7   accompaniment tracks were observed being used.

8   124.  In connection with those shows, Defendants IMPERIAL PALACE HOTEL &

9   CASINO and HARRAH'S IMPERIAL PALACE CORPORATION repeatedly displayed the

10  Sound Choice Marks without right or license.

11  125.  Defendants IMPERIAL PALACE HOTEL & CASINO and HARRAH'S

12  IMPERIAL PALACE CORPORATION have advertised or otherwise indicated that they are in

13  possession of a library containing more than 200,000 tracks stored on their karaoke systems.

14  126.  Defendants ROLL 'N' MOBILE DJ'S AND KARAOKE TOO and KENNY

15  ANGEL were observed operating, through an employee or contractor known as "Sean

16  McDonald", a karaoke system to produce karaoke shows at multiple eating and drinking

17  establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks

18  were being used.

19  127.  In connection with those shows, Defendants ROLL 'N' MOBILE DJ'S AND

20  KARAOKE TOO and KENNY ANGEL repeatedly displayed the Sound Choice Marks without

21  right or license.

22  128.  Defendants ROLL 'N' MOBILE DJ'S AND KARAOKE TOO and KENNY

23  ANGEL regularly perform karaoke shows in separate eating and drinking establishments

24  simultaneously.

25  / / /

- 21 -

1    129.  Upon information and belief, Defendants ROLL 'N' MOBILE DJ'S AND

2    KARAOKE TOO and KENNY ANGEL are in possession of a library containing more than

3    36,000 karaoke accompaniment tracks stored on their karaoke system.

4    130.  Defendants PT'S PLACE and GOLDEN-PT'S PUB CHEYENNE-NELLIS 5,

5    LLC operate a karaoke system to produce a karaoke show at their eating and drinking

6    establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were

7    observed being used.

8    131.  In connection with those shows, Defendants PT'S PLACE and GOLDEN-PT'S

9    PUB CHEYENNE-NELLIS 5, LLC repeatedly displayed the Sound Choice Marks without right

10   or license.

11   132.  Defendants PT'S PUB and GOLDEN-PT'S PUB WEST SAHARA 8, LLC

12   operate a karaoke system to produce a karaoke show at their eating and drinking establishment in

13   which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

14   133.  In connection with those shows, Defendants PT'S PUB and GOLDEN-PT'S

15   PUB WEST SAHARA 8, LLC repeatedly displayed the Sound Choice Marks without right or

16   license.

17   134.  Defendants PT'S GOLD and GOLDEN-PT'S PUB CENTENNIAL 32, LLC

18   operate a karaoke system to produce a karaoke show at their eating and drinking establishment in

19   which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

20   135.  In connection with those shows, Defendants PT'S GOLD and GOLDEN-PT'S

21   PUB CENTENNIAL 32, LLC repeatedly displayed the Sound Choice Marks without right or

22   license.

23   136.  Defendants PT'S PLACE and GOLDEN-PT'S PUB STEWART-NELLIS 2, LLC

24   operate a karaoke system to produce a karaoke show at their eating and drinking establishment in

25   which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

137.   In connection with those shows, Defendants PT'S PLACE and GOLDEN-PT'S PUB STEWART-NELLIS 2, LLC repeatedly displayed the Sound Choice Marks without right or license.

138.   Defendants PT'S PUB and GOLDEN TAVERN GROUP, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

139.   In connection with those shows, Defendants PT'S PUB and GOLDEN TAVERN GROUP repeatedly displayed the Sound Choice Marks without right or license.

140.   Defendants STEVE & RAY KARAOKE and STEVE and RAY were observed operating a karaoke system to produce karaoke shows at multiple venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

141.   In connection with those shows, Defendants STEVE & RAY KARAOKE and STEVE and RAY repeatedly displayed the Sound Choice Marks without right or license.

142.   Upon information and belief, Defendants STEVE & RAY KARAOKE and STEVE and RAY perform regular karaoke shows at multiple eating and drinking establishments in this State.

143.   Defendants STEVE & RAY KARAOKE and STEVE and RAY have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke system.

144.   Defendants LEGENDS CASINO and PUGDAWGS, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

145.   In connection with those shows, Defendants LEGENDS CASINO and PUGDAWGS, LLC repeatedly displayed the Sound Choice Marks without right or license.

/ / /

- 23 -

1
2
3

146.   Defendants LEGENDS CASINO and PUGDAWGS, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

4
5
6

147.   Defendants STARMAKER KARAOKE and DEBBIE HARMS were observed operating a karaoke system to produce multiple karaoke shows at multiple venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

7
8

148.   In connection with those shows, Defendants STARMAKER KARAOKE and DEBBIE HARMS repeatedly displayed the Sound Choice Marks without right or license.

9
10
11

149.   Upon information and belief, Defendants STARMAKER KARAOKE and DEBBIE HARMS perform regular karaoke shows in multiple venues in this State using multiple karaoke systems.

12
13

150.   Defendants STARMAKER KARAOKE and DEBBIE HARMS regularly perform karaoke shows in separate venues simultaneously.

14
15
16

151.   Defendants STARMAKER KARAOKE and DEBBIR HARMS have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

17
18
19

152.   Defendants DECATUR RESTAURANT & TAVERN and DDRT, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

20
21
22

153.   In connection with those shows, Defendants DECATUR RESTAURANT & TAVERN and DDRT, LLC repeatedly displayed the Sound Choice Marks without right or license.

23
24
25

154.   Defendants DECATUR RESTAURANT & TAVERN and DDRT, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

- 24 -

155.   Defendants PUTTERS and LISA/CARRISON LTD, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

156.   In connection with those shows, Defendants PUTTERS and LISA/CARRISON LTD repeatedly displayed the Sound Choice Marks without right or license.

157.   Defendants PUTTERS and LISA/CARRISON LTD have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

158.   Defendants DJ TARA KING PRODUCTIONS and TARA KING were observed operating a karaoke system to produce multiple karaoke shows at multiple venues in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

159.   In connection with those shows, Defendants DJ TARA KING PRODUCTIONS and TARA KING repeatedly displayed the Sound Choice Marks without right or license.

160.   Upon information and belief, Defendants DJ TARA KING PRODUCTIONS and TARA KING perform regular karaoke shows at multiple venues in this State using multiple karaoke systems.

161.   Defendants DJ TARA KING PRODUCTIONS and TARA KING regularly perform karaoke shows at multiple separate eating and drinking establishments simultaneously.

162.   Defendants DJ TARA KING PRODUCTIONS and TARA KING have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

163.   Defendants KIXX BAR, BOULDER STATION CASINO, and NP BOULDER, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

164. In connection with those shows, Defendants KIXX BAR, BOULDER STATION CASINO, and NP BOULDER, LLC repeatedly displayed the Sound Choice Marks without right or license.

165. Defendants KIXX BAR, BOULDER STATION CASINO, and NP BOULDER, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

166. Defendants NPPALACE, LLC and PALACE STATION operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

167. In connection with those shows, Defendants NPPALACE, LLC and PALACE STATION repeatedly displayed the Sound Choice Marks without right or license.

168. Defendants NPPALACE, LLC and PALACE STATION have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

169. Defendants DANSING KARAOKE and KIRK (a/k/a "The Urban Cowboy – DJ" and "DJ Captain Kirk") were observed operating a karaoke system to produce multiple karaoke show at multiple eating and drinking establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

170. In connection with those shows, Defendants DANSING KARAOKE and KIRK repeatedly displayed the Sound Choice Marks without right or license.

171. Upon information and belief, Defendants DANSING KARAOKE and KIRK perform regular karaoke shows at multiple venues in this State using multiple karaoke systems.

172. Defendants DANSING KARAOKE and KIRK regularly perform karaoke shows at multiple separate eating and drinking establishments simultaneously.

/ / /

173.   Defendants DANSING KARAOKE and KIRK have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

174.   Defendants GILLEY'S LAS VEGAS, TREASURE ISLAND, and TREASURE ISLAND, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

175.   In connection with those shows, Defendants GILLEY'S LAS VEGAS, TREASURE ISLAND, and TREASURE ISLAND, LLC repeatedly displayed the Sound Choice Marks without right or license.

176.   Defendants GILLEY'S LAS VEGAS, TREASURE ISLAND, and TREASURE ISLAND, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

177.   Defendants HALF SHELL SEAFOOD AND GAMING and HALF SHELL, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

178.   In connection with those shows, Defendants HALF SHELL SEAFOOD AND GAMING and HALF SHELL, LLC repeatedly displayed the Sound Choice Marks without right or license.

179.   Defendants HALF SHELL SEAFOOD AND GAMING and HALF SHELL, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

180.   Defendants MEGA-MUSIC PRODUCTIONS and JAMES BELLAMY were observed operating a karaoke system to produce multiple karaoke shows at multiple eating and

- 27 -

drinking establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

181. In connection with those shows, Defendants MEGA-MUSIC PRODUCTIONS and JAMES BELLAMY repeatedly displayed the Sound Choice Marks without right or license.

182. Defendants MEGA-MUSIC PRODUCTIONS and JAMES BELLAMY have advertised or otherwise indicated that they are in possession of a library containing more than 135,000 tracks stored on their karaoke system.

183. Upon information and belief, Defendants MEGA-MUSIC PRODUCTIONS and JAMES BELLAMY perform regular karaoke shows at multiple venues in this State.

184. Defendants MR. D'S SPORTS BAR and SPORTS BAR, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

185. In connection with those shows, Defendants MR. D'S SPORTS BAR and SPORTS BAR, LLC repeatedly displayed the Sound Choice Marks without right or license.

186. Defendants MR. D'S SPORTS BAR and SPORTS BAR, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 135,000 tracks stored on their karaoke systems.

187. Defendants SOUND SELECT and RICK DOMINGUEZ (a/k/a "Rick D"), were observed operating a karaoke system to produce multiple karaoke shows at multiple eating and drinking establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

188. In connection with those shows, Defendants SOUND SELECT and RICK DOMINGUEZ repeatedly displayed the Sound Choice Marks without right or license.

///

///

- 28 -

189. Defendants SOUND SELECT and RICK DOMINGUEZ have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

190. Upon information and belief, Defendants SOUND SELECT and RICK DOMINGUEZ perform regular karaoke shows at multiple eating and drinking establishments in this State.

191. Defendants ISLAND GRILL and OFFICE 7 LOUNGE & RESTAURANT, INC. operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

192. In connection with those shows, Defendants ISLAND GRILL and OFFICE 7 LOUNGE & RESTAURANT, INC. repeatedly displayed the Sound Choice Marks without right or license.

193. Defendants ISLAND GRILL and OFFICE 7 LOUNGE & RESTAURANT, INC. have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

194. Defendants JAKE'S BAR and DOC, G. & G., INC. operate a karaoke system to produce a karaoke show at their eating and drinking establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

195. In connection with those shows, Defendants JAKE'S BAR and DOC, G. & G., INC. repeatedly displayed the Sound Choice Marks without right or license.

196. Defendants JAKE'S BAR and DOC, G. & G., INC. have advertised or otherwise indicated that they are in possession of a library containing more than 200,000 tracks stored on their karaoke systems.

197. Defendants SHOWTYME KARAOKE & DJ, MIKE CORRAL and DAVE CORRAL (a/k/a "Crazy Dave" and "Mad Mike") were observed operating a karaoke system to

1  produce a karaoke show at a venue in this State in which counterfeit copies of SLEP-TONE's

2  accompaniment tracks were being used.

3      198.  In connection with that show, Defendants SHOWTYME KARAOKE & DJ,

4  MIKE CORRAL and DAVE CORRAL repeatedly displayed the Sound Choice Marks without

5  right or license.

6      199.  Defendants CALICO JACK'S SALOON and MIKE R. GORDON operate a

7  karaoke system to produce a karaoke show at their eating and drinking establishment in which

8  counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

9      200.  In connection with those shows, Defendants CALICO JACK'S SALOON and

10  MIKE R. GORDON repeatedly displayed the Sound Choice Marks without right or license.

11      201.  Defendants RED LABEL LOUNGE and RED LABEL BAR, INC. operate a

12  karaoke system to produce a karaoke show at their eating and drinking establishment in which

13  counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

14      202.  In connection with those shows, Defendants RED LABEL LOUNGE and RED

15  LABEL BAR, INC. repeatedly displayed the Sound Choice Marks without right or license.

16      203.  Defendants TERRY-OKE KARAOKE and TERRY CICCI were observed

17  operating a karaoke system to produce multiple karaoke shows at multiple eating and drinking

18  establishments in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks

19  were being used.

20      204.  In connection with those shows, Defendants TERRY-OKE KARAOKE and

21  TERRY CICCI repeatedly displayed the Sound Choice Marks without right or license.

22      205.  Defendants KJ'S BAR & GRILL and L.T. BOND, INC. operate a karaoke system

23  to produce a karaoke show at their eating and drinking establishment in which counterfeit copies

24  of SLEP-TONE's accompaniment tracks were observed being used.

25  ///

206. In connection with those shows, Defendants BAR & GRILL and L.T. BOND, INC. repeatedly displayed the Sound Choice Marks without right or license.

207. Defendants VISION & SOUND ENTERTAINMENT and TIM MILLER (a/k/a "Diamond Tim") were observed operating a karaoke system to produce a karaoke show at an eating and drinking establishment in this State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

208. In connection with that show, Defendants VISION & SOUND ENTERTAINMENT and TIM MILLER repeatedly displayed the Sound Choice Marks without right or license.

209. Defendants VISION & SOUND ENTERTAINMENT and TIM MILLER have advertised or otherwise indicated that they are in possession of a library containing more than 365,000 tracks stored on their karaoke system.

210. Defendants THUNDERBIRD LOUNGE AND BAR, ARUBA HOTEL & SPA, THUNDERBIRD BAR & LOUNGE, LLC and IRVINGTON PROPERTIES, LLC operate a karaoke system to produce a karaoke show at their eating and drinking establishment(s) in which counterfeit copies of SLEP-TONE's accompaniment tracks were observed being used.

211. In connection with those shows, Defendants THUNDERBIRD LOUNGE AND BAR, ARUBA HOTEL & SPA, THUNDERBIRD BAR & LOUNGE, LLC, and IRVINGTON PROPERTIES, LLC repeatedly displayed the Sound Choice Marks without right or license.

212. Defendants THUNDERBIRD LOUNGE AND BAR, ARUBA HOTEL & SPA, IRVINGTON PROPERTIES, LLC and THUNDERBIRD BAR & LOUNGE, LLC have advertised or otherwise indicated that they are in possession of a library containing more than 365,000 tracks stored on their karaoke systems.

213. Defendants AUDIO THERAPY DJ, AUDIO THERAPY and MATTE McNULTY were observed operating, through employees or contractors known as "DJ Matte &

- 31 -

1   Jaz", a karaoke system to produce a karaoke show at an eating and drinking establishment in this

2   State in which counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

3          214.  In connection with those shows, Defendants AUDIO THERAPY DJ, AUDIO

4   THERAPY and MATTE McNULTY repeatedly displayed the Sound Choice Marks without

5   right or license.

6          215.  Upon information and belief, Defendants AUDIO THERAPY DJ, AUDIO

7   THERAPY and MATTE McNULTY perform regular karaoke shows at multiple eating and

8   drinking establishments in this State using multiple karaoke systems.

9          216.  Defendants AUDIO THERAPY DJ, AUDIO THERAPY and MATTE

10  McNULTY have advertised or otherwise indicated that they are in possession of a library

11  containing more than 100,000 tracks stored on their karaoke systems.

12         217.  Defendants GOLD SPIKE HOTEL AND CASINO, GOLD SPIKE HOLDINGS,

13  LLC and GSTI HOLDINGS, LLC operate a karaoke system to produce a karaoke show at their

14  eating  and  drinking  establishment(s)  in  which  counterfeit  copies  of  SLEP-TONE's

15  accompaniment tracks were observed being used.

16         218.  In connection with those shows, Defendants GOLD SPIKE HOTEL AND

17  CASINO, GOLD SPIKE HOLDINGS, LLC and GSTI HOLDINGS, LLC repeatedly displayed

18  the Sound Choice Marks without right or license.

19         219.  Defendants GOLD SPIKE HOTEL AND CASINO, GOLD SPIKE HOLDINGS,

20  LLC and GSTI HOLDINGS, LLC have advertised or otherwise indicated that they are in

21  possession of a library containing more than 100,000 tracks stored on their karaoke systems.

22         220.  Defendants MARDI GRAS LOUNGE-BEST WESTERN and THE NEVADIAN,

23  INC. operate a karaoke system to produce a karaoke show at their eating and drinking

24  establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were

25  observed being used.

- 32 -

1       221.  In connection with those shows, Defendants MARDI GRAS LOUNGE-BEST

2  WESTERN and THE NEVADIAN, INC. repeatedly displayed the Sound Choice Marks without

3  right or license.

4       222.  Defendants MARDI GRAS LOUNGE-BEST WESTERN and THE NEVADIAN,

5  INC. have advertised or otherwise indicated that they are in possession of a library containing

6  more than 100,000 tracks stored on their karaoke systems.

7       223.  Defendants BEST WESTERN MARDI GRAS INN and J.P.P.J. OF NEVADA,

8  INC. operate a karaoke system to produce a karaoke show at their eating and drinking

9  establishment in which counterfeit copies of SLEP-TONE's accompaniment tracks were

10  observed being used.

11       224.  In connection with those shows, Defendants BEST WESTERN MARDI GRAS

12  INN and J.P.P.J. OF NEVADA, INC. repeatedly displayed the Sound Choice Marks without

13  right or license.

14       225.  Defendants BEST WESTERN MARDI GRAS INN and J.P.P.J. OF NEVADA,

15  INC. have advertised or otherwise indicated that they are in possession of a library containing

16  more than 100,000 tracks stored on their karaoke systems.

17       226.  Defendants TJ'S ALL-STAR KARAOKE and JOHN MENNITI were observed

18  operating a karaoke system to produce a karaoke show at a venue in this State in which

19  counterfeit copies of SLEP-TONE's accompaniment tracks were being used.

20       227.  In connection with that show, Defendants TJ'S ALL-STAR KARAOKE and

21  JOHN MENNITI repeatedly displayed the Sound Choice Marks without right or license.

22       228.  Defendants HARRAH'S LAS VEGAS and CAESAR'S ENTERTAINMENT

23  CORPORATION operate a karaoke system to produce a karaoke show at their eating and

24  drinking establishment(s) in which counterfeit copies of SLEP-TONE's accompaniment tracks

25  were observed being used.

1    229.   In connection with those shows, Defendants HARRAH'S LAS VEGAS and

2    CAESAR'S ENTERTAINMENT CORPORATION repeatedly displayed the Sound Choice

3    Marks without right or license.

4    230.   Each of the Defendants has possessed, used, or authorized or benefited from the

5    use and display of unauthorized counterfeit goods bearing the Sound Choice Marks, or has

6    provided, advertised, or authorized or benefited from the provision of services in connection with

7    the Sound Choice Marks.

8    231.   Upon information and belief, each of those karaoke systems has a library

9    containing a minimum of 8,500 tracks stored thereon, to facilitate their use simultaneously at

10   separate venues or events.

11   232.   Based upon the popularity of SLEP-TONE's music and the size of the

12   Defendants' respective libraries, which vary between 8,500 and 365,000 songs, operating in

13   many cases with multiple karaoke systems, the Plaintiff has a good-faith belief that discovery

14   will show that each of the Defendants (a) is in possession of unauthorized counterfeit goods

15   bearing the Sound Choice Marks, or (b) knowingly benefits from and/or has the capacity to

16   control the infringing conduct of others.

17   233.   Each of the Defendants is accused of committing acts of infringement, unfair

18   competition, and deceptive and unfair trade practices in substantially the same way, namely,

19   through the use of counterfeit karaoke tracks to perform karaoke-related services.

20   234.   Though created through unauthorized duplication, the counterfeit karaoke tracks

21   obtained or made by the Defendants all originated, directly or indirectly in an unbroken

22   sequence, from the same ultimate source, namely, from compact discs sold by the Plaintiff and

23   made from master recordings belonging to the Plaintiff.

24   235.   As such, the Plaintiff's right to relief, as stated in the paragraphs below, ultimately

25   arises out of the same series of transactions and occurrences.

- 34 -

1     236.    This action raises substantial questions of law and fact common to all of the

2     defendants hereto.

3

4                                **FIRST CLAIM FOR RELIEF**
                             **TRADEMARK INFRINGEMENT**
5

6     237.    Plaintiff SLEP-TONE realleges each and every allegation set forth in the

7     foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

8     238.    Each of the Defendants used, or authorized or directly benefited from the use of, a

9     reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of

10    services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit,

11    or copy of the Sound Choice Marks and by displaying the reproduction, counterfeit, or copy of

12    the Sound Choice Marks during the provision of those services.

13    239.    The Defendants' use of the Sound Choice Marks was "in commerce" within the

14    meaning of the Trademark Act of 1946 as amended.

15    240.    Plaintiff SLEP-TONE did not license any of the Defendants to manufacture or

16    acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection

17    with the provision of their services.

18    241.    The Defendants' use of the Sound Choice Marks is likely to cause confusion, or

19    to cause mistake, or to deceive the Defendants' customers and patrons into believing that the

20    Defendants' services are being provided with the authorization of the Plaintiff and that the

21    Defendants music libraries contain bona fide Sound Choice accompaniment tracks.

22    242.    The acts of each of the Defendants were willful.

23    243.    Unless enjoined by the Court, the Defendants' infringing activities as described

24    above will continue unabated and will continue to cause harm to the Plaintiff.

25    ///

- 35 -

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**

244.   Plaintiff SLEP-TONE realleges each and every allegation set forth in paragraphs 1-236 and 238-243, as though fully set forth herein, and incorporates them herein by reference.

245.   On each occasion when they caused a SLEP-TONE accompaniment track to be played during a karaoke show, the Defendants displayed the Sound Choice Marks in connection with the Defendants' karaoke services.

246.   The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that SLEP-TONE sponsored or approved the Defendants' services and commercial activities.

247.   The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by SLEP-TONE and purchased by the Defendants.

248.   The Defendants' use of the Sound Choice Marks in this fashion would have inured to the benefit of the Plaintiff if the Defendants had legitimately acquired genuine Sound Choice disks instead of counterfeiting them or acquiring counterfeit copies, in that the Plaintiff would have received revenue from such sales.

249.   Because SLEP-TONE has been denied this revenue, it has been damaged by the Defendants' uses.

250.   Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to the Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SLEP-TONE demands trial by jury and prays for judgment against each of the Defendants severally and that the Court:

- 36 -

A.   Find that each of the Defendants has, directly and/or vicariously through the contractors they hired, committed acts of trademark infringement, including, but not limited to, counterfeiting of the federally registered Sound Choice Marks;

B.   Find that each of the Defendants has engaged in unfair competition against Plaintiff SLEP-TONE in violation of 15 U.S.C. § 1125(a);

C.   Find that each of the Defendants has committed deceptive and unfair trade practices under Nevada law;

D.   Enter judgment against each of the Defendants and in favor of SLEP-TONE;

E.   Find the that Defendants' activities were in all respects conducted willfully and for profit;

F.   Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' conduct in infringing the Sound Choice Marks, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount of $2,000,000 per trademark infringed, per Defendant;

G.   Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), plus reasonable attorneys' fees and costs of suit;

H.   Award to SLEP-TONE treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

I.   Order the seizure of all computer disks, drives, or other media belonging to any of the Defendants, which media contain illegal counterfeits of registered trademarks;

J.   Grant SLEP-TONE preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by the Defendants;

/ / /

/ / /

/ / /

1    K.    Award SLEP-TONE its costs of suit and attorney's fees, to the extent not awarded above;

2          and

3    L.    Grant SLEP-TONE such other and further relief as justice may require.

4

5    Dated:  February 10, 2012                    BORIS & ASSOCIATES

6

7                                                 By:  _____/s/_____

8                                                 Donna Boris Cal. State Bar # 153033
                                                  donna@borislaw.com
9                                                 Attorneys for Plaintiff

10

11   Dated:  February 10, 2012                    LAW OFFICES OF KERRY FAUGHNAN

12

13                                                By: _____/s/_____

14                                                Kerry Faughnan Nevada State Bar # 12204
                                                  kerry.faughnan@gmail.com
15                                                Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

- 38 -